## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **STEPHANIE COHEN** | : | |
| and | : | |
| **SUNDA CROONQUIST,** | : | |
| **individually and on behalf of all others** | : | |
| **similarly situated,** | : | |
| Plaintiffs, | : | |
| **v.** | : | |
| | : | |
| **WARNER CHILCOTT PUBLIC LIMITED** | : | |
| **COMPANY; WARNER CHILCOTT** | : | **1:06-cv-00401-CKK** |
| **HOLDINGS COMPANY III, LTD.;** | : | |
| **WARNER CHILCOTT CORPORATION;** | : | **ORAL ARGUMENT REQUESTED** |
| **WARNER CHILCOTT (US) INC.;** | : | |
| **WARNER CHILCOTT COMPANY, INC.;** | : | |
| **GALEN (CHEMICALS), LTD.;** | : | |
| and | : | |
| **BARR PHARMACEUTICALS, INC.,** | : | |
| Defendants. | : | |

# FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

### CONSUMER PLAINTIFFS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

**Dated:  July 28, 2006**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 2 |
| III. | ARGUMENT | 7 |
| | A.  CLASS CERTIFICATION IS FAVORED IN ANTITRUST CASES | 7 |
| | B.  CLASS CERTIFICATION STANDARD | 9 |
| | C.  THIS ACTION SATISFIES THE REQUIREMENTS OF RULE 23(a) | 10 |
| | D.  THIS ACTION FULFILLS THE REQUIREMENTS OF RULE 23(b)(2) | 16 |
| | E.  THIS ACTION FULFILLS THE REQUIREMENTS OF RULE 23(b)(3) | 18 |
| IV. | CONCLUSION | 35 |

## **Table of Authorities**

*In re Alcoholic Beverages Litig.,*                                    24
95 F.R.D. 321 (E.D.N.Y. 1982)

*In re Aluminum Phosphide Antitrust Litig.,*                           14
160 F.R.D. 609 (D. Kan. 1995)

*In re Ampicillin Antitrust Litigation*                                9, 12
 55 F.R.D. 269 (D.D.C.1972)

*Appleton Electric Co. v. Advance United Expressways,*                 33
 494 F.2d 126 (7th Cir. 1974)

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*                    21
472 U.S. 585 (1985)

*In re Auction Houses Antitrust Litig.,*                               24
 193 F.R.D. 162,  (S.D.N.Y. 2000)

*Brown v. Pro Football, Inc.,*                                         9
146 F.R.D. 1 (D.D.C. 1992)

*Bruce's Juices. Inc. v. American Can Co.,*                            7
330 U.S. 743 (1947)

*In re Buspirone Patent & Antitrust Litigation,*                       9
210 F.R.D. 43 (S.D.N.Y. 2002)

*Bynum v. District of Columbia*,                                       17
217 F.R.D. 43 (D.D.C.2003)

*In re Cardizem CD Antitrust Litig.,*                                  *passim*
200 F.R.D. 326 (E.D. Mich. 2001)

*Catfish Antitrust Litig.,*                                            14
826 F. Supp. 1019 (N.D. Miss. 1993)

*Chase v. Northwest Airlines Corp.,*                                   19
 49 F. Supp. 2d 553 (E.D. Mich. 1999*)*

*Chattanooga Foundry* & *Pipe Works v. Atlanta,*                       23
 203 U.S. 390 (1906);

*In re Citric Acid Antitrust Litig.,*                                  21
1996 WL 655791, *7 (N.D.Cal 1996)

*City of New York v. General Motors Corp.,*                                          20
 60 F.R.D. 393 (S.D.N.Y. 1973), *appeal dismissed,*
 501 F.2d 639 (2d Cir. 1974)

*In re Commercial Tissue Antitrust Litig.,*                                          9
183 F.R.D. 589 (N.D. Fla. 1998)

*Community Communications Co., Inc. v. City of Boulder. Colo.,*                       7
455 U.S. 40 (1982)

*Davis v. Southern Bell Tel. & Tel. Co.,*                                            16, 18
1993 WL 593999 (S.D. Fla. 1993)

*Diaz v. Hillsborough County Hospital Authority*,                                    17
165 F.R.D. 689, 695 (M.D.Fla.1996)

*In re Disposable Contact Lens Antitrust Litig.,*                                    22, 33
170 F.R.D. 524 (M.D. Fla. 1996)

*In re Domestic Air Transp. Antitrust Litig.,*                                       18, 32, 33
137 F.R.D. 677 (N.D.Ga.1991)

*Does I through III v. District of Columbia*,                                        17
232 F.R.D. 18 (D.D.C. 2005)

*In re Folding Carton Antitrust Litig.,*                                             32
75 F.R.D. 727 (N.D. Ill. 1977)

*Gen. Tel. Co. v. E.E.O.C.,*                                                         13
 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)

*Handicomp, Inc. v. United States Golf Ass'n.,*                                      19
2000 WL 426245 (3rd. Cir. 2000)

*Harriss v. Pan American World Airways, Inc*.,                                       17
74 F.R.D. 24 (N.D.Cal.1977)

*Hassine v. Jeffes,*                                                                 11
846 F.2d 169 (3d Cir. 1988)

*Hawaii v. Standard Oil Co. of Cal.,*                                                8
405 U.S. 251 (1972)

*In re Independent Gasoline Antitrust Litig*.,                                       22
79 F.R.D. 552 (D. Md. 1978)

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
1994 U.S. Dist. LEXIS 12652  (N.D. Cal. Sept. 2, 1994)                32

*Jack Faucett Assoc. v. American Tel. & Tel.* Co.,
No. 81-1804,1983 WL4601                                               27

*Jennings Oil Co.. Inc. v. Mobil Oil Corp.,*
80 F.R.D. 124 (S.D.N.Y. 1978)                                        20

*Lawlor v. National Screen Service Corp.,*
349 U.S. 322 (1955)                                                   7

*Lee-Moore Oil Co. v. Union Oil* Co..
599 F.2d 1299 (4th Cir. 1999)                                        23

*In re Little Caesar Enterprises, Inc. v. Smith*,
172 F.R.D. 236 (E.D. Mich. 1997)                                     22

*In re Linerboard Antitrust Litig.,*
2001 WL 1025390  (E.D. Pa. 2001).                                    *passim*

*In re Lorazepam & Clorazepate Antitrust Litigation,*
202 F.R.D. 12 (D.D.C. 2001)                                          *passim*

*In re LowerLakeErie Iron Ore Antitrust Litig.,*
 998 F.2d 1144 (3d Cir. 1993)                                        23

*Lumco Indus., Inc. v. Jeld-Wen, Inc.,*
171 F.R.D. 168 (E.D.Pa. 1997)                                        21, 22

*In re NASDAQ Market-Makers Antitrust Litigation,*
169 F.R.D. 493 (S.D.N.Y 1996)                                        *passim*

*In re Northwest Airlines Corp. Antitrust Litig.,*
208 F.R.D. at 174-75 (E.D. Mich. 2002                                24

*Perma Life Mufflers v. International Parts Corp.,*
392 U.S. 134 (1968)                                                   7

*Pillsbury Co. v. Conboy*,
459 U.S. 248 (1983*)*                                                 7

*In re Playmobil Antitrust Litig.*
35 F.Supp.2d 231 (E.D.N.Y. 1998)                                     11, 13, 14

*In re Plywood Antitrust Litig.,*
76 F.R.D. 570 (E.D. La. 1976)                                          33

*In re Polypropylene Carpet Antitrust Litig.,*
178 F.R.D. 603 (N.D.Ga.1997)                                          22

*In re Potash Antitrust Litig.,*
159 F.R.D. 682 (D.Minn.1995))                                      14, 19, 33

*In re Prudential Ins. Co. of America Sales Practice Litig.,*
148 F.3d 283 (3d Cir. 1998)                                           11

*Ravavort v. U.S. Dept. of Treasury,*
59 F. 3d 212 (D.C. Cir. 1995)).                                       30

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979)                                                    7

*In re Sugar Indus. Antitrust Litig.,*
1976 WL 1374 (N.D. Cal 1976)                                          21

*In re Synthroid Marketing Litig.,*
188 F.R.D. 295 (N.D. Ill. 1999)                                      10, 32

*Twelve John Does v. District of Columbia,*
117 F.3d 571 (D.C.Cir.1997))                                          15

*United States v. E.I. du Pont de Nemours & Co.,*
351. U.S. 377 (1956)                                                  20

*U.S. v. Grinnell,*
384 U.S. 563 (1966)                                                 19, 21

*United States v. Topco Associates, Inc.,*
405 U.S. 596 (1972))                                                   7

*In re Veneman,*
309 F.3d 789 (D.C. Cir. 2002)                                        9, 10

*In re Vitamins Antitrust Litig.,*
209 F.R.D. 251 (D.D.C. 2002)                                        passim

*In re Warfarin Sodium Antitrust Litig,*
214 F.3d 395 (3d Cir. 2000)                                         16, 18

*Williams v. Empire Funding Corp.,*                                   11

183 F.R.D. 428 (E.D. Pa. 1998)

*Zenith Radio Corp. v. Hazeltine Research. Inc.,*                    7, 21, 23
395 U.S. 100 (1969)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEPHANIE COHEN | : | |
| and | : | |
| SUNDA CROONQUIST, | : | |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| WARNER CHILCOTT PUBLIC LIMITED | : | |
| COMPANY; WARNER CHILCOTT | : | 1:06-cv-00401-CKK |
| HOLDINGS COMPANY III, LTD.; | : | |
| WARNER CHILCOTT CORPORATION; | : | ORAL ARGUMENT REQUESTED |
| WARNER CHILCOTT (US) INC.; | : | |
| WARNER CHILCOTT COMPANY, INC.; | : | |
| GALEN (CHEMICALS), LTD.; | : | |
| and | : | |
| BARR PHARMACEUTICALS, INC., | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**I.    INTRODUCTION**

Plaintiffs submit this Memorandum of Law in support of their Motion for

Class Certification pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), seeking

certification of the following class or sub-classes, designating of plaintiffs as the

class representatives, and appointment of their counsel as class counsel:

All persons throughout the United States who purchased Ovcon for
personal use at any time during the period from April 22, 2004 to
the present seeking injunctive relief under the Sherman Act (Counts
I and II);

All persons who purchased, in any of the "Indirect Purchaser
States," Ovcon for personal use at any time during the period from
April 22, 2004 to the present (Count III) (hereinafter "Indirect
Purchaser Subclass"), excluding any persons who suffered no
economic harm as a result of Defendants' conduct;

All persons who purchased, in any of the fifty states, Ovcon for personal use at any time during the period from April 22, 2004 to the present (Count IV);

Excluded from the above are all governmental entities and the Defendants and their respective subsidiaries and affiliates

Ovcon 35 ("Ovcon") is a brand-name oral contraceptive available to the general public as a prescription pharmaceutical since approximately 1976. Ovcon has no patent protection.  No generic, less expensive version of Ovcon is currently marketed in the United States, because Defendants Warner Chilcott and Barr Pharmaceuticals, Inc. ("Barr") illegally agreed in 2004 to delay until 2009 the entry of a generic version of Ovcon into the domestic market, resulting in plaintiffs, and the indirect purchasers they seek to represent, being compelled to overpay for Ovcon. Defendants' *per se* illegal conduct has robbed these consumers of millions of dollars in savings that they would have realized in a competitive market that included a generic version of Ovcon.

## II.    <u>FACTUAL BACKGROUND</u>

Warner Chilcott and Barr entered into their illegal agreement in March 2004.  Warner Chilcott agreed to pay, and then paid, Barr a total of $20 million in exchange for Barr's agreement to refrain from selling Barr's generic version of Ovcon, which would otherwise have been available by no later than April 22, 2004.

Defendants' agreement unquestionably frustrated the federal drug laws and regulatory procedures designed to facilitate competition from lower-priced

generic drugs.[1]  In 1984, Congress enacted the Hatch-Waxman Act, which

permits a manufacturer seeking FDA approval for a generic drug to file an

Abbreviated New Drug Application ("ANDA"). 21 U.S.C § 355(j) (2005). An ANDA

filer may rely on the safety and efficacy data previously provided in the NDA for

its branded counterpart. FDA approval of an ANDA takes, on average, about 18

months.  FDA-approved generic drugs are certified by the FDA as bioequivalent

to the branded drug, upon whose NDA the generic drug relied upon in its ANDA,

and are completely interchangeable with that branded drug. The FDA refers to

such drugs as "AB-rated." A generic drug that is "AB-rated" may be listed in the

Orange Book and dispensed by a pharmacist in lieu of its branded counterpart.

Upon their introduction, generic drugs are generally priced 30 to 50

percent (or more) below the price of their brand-name equivalents. Because

generic and branded drugs are fully interchangeable in terms of safety and

efficacy, purchasers may choose to purchase the less expensive generic instead

of the brand-name drug.[2]

---

[1] The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et *seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), and the Medicare Prescription Drug, Improvement and Modernization Act of 2003, codified at 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) (2005). These consumer-oriented revisions must be read in the context of the basic drug approval process. Before a manufacturer can market a new drug in the United States, it must obtain approval from the United States Food and Drug Administration ("FDA").  The FDA maintains a list of approved "Reference Listed Drugs" in a publication entitled, "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly known as the "Orange Book."  A manufacturer seeking to market a new drug must file with the FDA a New Drug Application (NDA), demonstrating the safety and efficacy of its product. 21 U.S.C. § 355(b) (2005). Once the FDA approves the NDA, the manufacturer may market the branded drug, and the branded drug may be listed in the Orange Book. The NDA process is typically time-consuming and expensive.

[2] Almost all states (and the District of Columbia) encourage generic competition through laws that allow pharmacists to substitute brand-name drugs with their "AB-rated" generic equivalents, unless a physician directs or the patient requests otherwise.  Many third-party payors of prescription drugs (e.g., health insurance plans, Medicaid programs) have adopted policies to encourage the substitution of available AB-rated generic drugs for their branded counterparts.

Prior to 2000, Bristol-Myers Squibb Company ("BMS") manufactured, distributed, and marketed Ovcon in the United States.  On January 26, 2000, Warner Chilcott purchased from BMS certain rights, title, and interests in Ovcon, by which Warner Chilcott began marketing Ovcon manufactured by BMS; Warner Chilcott continues to be the exclusive marketer of Ovcon in the United States. Ovcon is and has been one of Warner Chilcott's highest revenue-producing products—Ovcon's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price. For the twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon were approximately $71.5 million.

In September 2001, Barr filed an ANDA with the FDA for approval to market an AB-rated generic version of Ovcon.  In January 2003, Barr announced its intention to launch a generic version of Ovcon by the end of that year, intending to sell generic Ovcon at a price approximately 30% below the price Warner Chilcott charged for branded Ovcon.  Warner Chilcott expected Barr to price its generic Ovcon at approximately 30% below the price Warner Chilcott charged for Ovcon.  Barr projected that within its first year of introduction, generic Ovcon would capture approximately 50% of Warner Chilcott's branded Ovcon sales.  Warner Chilcott projected that within its first year of introduction, generic Ovcon would capture at least 50% of Ovcon's new prescriptions. Warner Chilcott calculated that, as a result of these prescriptions lost to Barr's generic Ovcon, its

---

Purchasers benefit from the introduction of generic drugs in the form of lower prices. A 1998 Congressional Budget Office Report estimated that in 1994 alone, consumers saved $8 to $l0 billion on prescriptions at retail pharmacies by purchasing generic drugs in place of the brand-name equivalents.

net revenues from the sale of branded Ovcon would decline by at least $100 million over a three-year period.

To eliminate this competitive threat and to protect its Ovcon revenues, Warner Chilcott first embarked on a strategy to convert Ovcon customers to a chewable form of the product (Ovcon Chewable) and to stop selling branded Ovcon before Barr entered the market. Prescriptions for Ovcon Chewable would not be able to be filled with Barr's generic Ovcon because Barr's generic Ovcon would not be AB-rated to Ovcon Chewable. Since the switch to a chewable form of Ovcon would have no real benefits to patients, it was obviously designed by Warner Chilcott to preserve its monopoly profits on Ovcon. By mid-2003, however, Warner Chilcott's anti-competitive "chewable" strategy was in jeopardy: the entry of Barr's generic Ovcon was imminent, and the FDA had not yet approved Ovcon Chewable for sale. In May 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that Barr's generic Ovcon entry was the "biggest risk to the company."

By the summer of 2003, Warner Chilcott believed that Barr's generic Ovcon entry could occur as early as September. In August 2003, Warner Chilcott and Barr discussed an express arrangement under which Barr would refrain from competing with Warner Chilcott's branded Ovcon. On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent to enter into a non-compete agreement by which (a) Warner Chilcott would pay Barr $20 million not to compete in the United States with Barr's generic Ovcon product for a term of five years following Barr's final FDA approval for generic Ovcon; and (b) rather

than enter the market as a competitor, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott if Warner Chilcott so requested.

On March 24, 2004, Defendants formalized their non-compete agreement ("Agreement"), as contemplated by their Letter of Intent. Under the Agreement Warner Chilcott first paid Barr $1 million; within 45 days after FDA approval of Barr's generic Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's commitment to refrain from marketing generic Ovcon in the United States, either by itself, or through a license, for five years.  On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon.

On April 23, 2004, Barr announced its intent to begin marketing generic Ovcon under the name "Balziva" in the event Warner Chilcott chose not to exercise its option under the Agreement.  On May 6, 2004, Warner Chilcott exercised its option under the Agreement: and paid Barr $19 million to secure Barr's commitment not to compete with Warner Chilcott by introducing generic Ovcon into the market.  Under the terms of the Agreement, because of Warner Chilcott's payment to Barr, Barr cannot sell generic Ovcon in the United States for five years, or until approximately May 2009.  Absent this Agreement, Barr would have begun marketing its generic Ovcon after it received FDA approval of its ANDA on or about April 22, 2004.

Barr has abided by the Agreement not to sell generic Ovcon in the United States. To date, no other company has received FDA approval to market a generic version of Ovcon.  If Barr had introduced its generic product, Plaintiffs and members of the Class would have substituted Barr's lower-priced generic

Ovcon for all or a portion of their purchases of branded Ovcon, and/or would have paid substantially less for branded Ovcon because Warner Chilcott would have provided discounts in response to competition.  As a consequence of Defendants' Agreement, Plaintiffs and members of the Class have been deprived of the benefits of free and open competition in their purchases. Purchasers of Ovcon were required to continue purchasing branded Ovcon when a substantially less expensive product would have otherwise been available.

## III.   ARGUMENT

### A.  Class Certification is Favored in Antitrust Cases.

The antitrust laws are "as important to the preservation of economic freedom and our free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."  *Community Communications Co., Inc. v. City of Boulder. Colo.,* 455 U.S. 40, 56 n.19 (1982) (quoting *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610 (1972)). Private enforcement of the antitrust laws is essential to protecting our free-enterprise system.[3]  Indeed, the Supreme Court has called the private civil action "a bulwark of antitrust enforcement," whereby the purposes of the federal antitrust laws are best served by the ever-present threat of these types of lawsuits to deter anyone contemplating business misbehavior.  *Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 139 (1968).

The Supreme Court has stressed the importance of antitrust class actions:

---

[3]     *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248,262-63 (1983*); Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Zenith Radio Corp. v. Hazeltine Research. Inc.,* 395 U.S. 100, 130-31 (1969); *Lawlor v. National Screen Service Corp.,* 349 U.S. 322,329 (1955); *Bruce's Juices. Inc. v. American Can Co.,* 330 U.S. 743,751-52 (1947).

Class actions play a crucial role in promoting the enforcement of the antitrust laws. Every violation of the antitrust laws is a blow to the free enterprise system envisaged by Congress. *See Northern Pacific R. Co. v. United States,* 356 U.S. 1 (1958). This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. In enacting these laws, Congress had many means at its disposal to penalize violators.. . . Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'

* * * *

Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.

*Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 262, 266 (1972). Moreover,

this Court has stated:

The treble damages provision . . . was designed to encourage private enforcement of the antitrust laws by enforcing generous recompense to those harmed by the proscribed conduct and simultaneously to erect a deterrent to those contemplating similar conduct in the future. . . . Moreover, it has long been recognized that class actions play an important role in the private enforcement of antitrust action. Further, courts tend to favor class certification when in doubt.

*In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 258 (D.D.C. 2002) (citations omitted) ("*Vitamins*").

Additionally, in *In re Lorazepam & Clorazepate Antitrust Litigation,* 202

F.R.D. 12 (D.D.C. 2001) ("*Lorazepam*"), this Court observed:

Long ago the Supreme Court recognized the importance that class actions play in the private enforcement of antitrust class actions. . . . Accordingly, courts have repeatedly found antitrust claims to be particularly well suited for class actions: The treble-damages provision . . . was designed to encourage private enforcement of the antitrust laws and simultaneously to erect a deterrent to those

> contemplating similar conduct in the future. These linked objectives
> could not be fully realized if large numbers of potential claimants
> are not afforded an efficient and cost effective method of vindicating
> their claims. The class action device is well-suited to afford the
> desired access.

*Lorazepam*, 202 F.R.D. at 21 (citation omitted).

Since private class actions play a crucial role in the enforcement of antitrust laws,  courts have repeatedly certified similar cases involving horizontal agreements between competitors that have artificially inflated prices.  *See, e.g., Vitamins; Lorazepam; Brown v. Pro Football, Inc.,* 146 F.R.D. 1 (D.D.C. 1992); *In re Ampicillin Antitrust Litig.,* 55 F.R.D. 269, 273 (D.D.C. 1972) ("*Ampicillin I*"); *see also In re Buspirone Patent & Antiturst Liitigation,* 210 F.R.D. 43 (S.D.N.Y. 2002) ("*Buspirone*"); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 352 (E.D. Mich. 2001) ("*Cardizem*")

**B. Class Certification Standard.**

When making a class action determination, the sole issue before the court is whether plaintiff is asserting a claim which, assuming its merit, will satisfy the requirements of Federal Rule of Civil Procedure 23*. In re Veneman,* 309 F.3d 789, 795 (D.C. Cir. 2002) (court should not "inappropriately mix the issue of class certification with the merits").  For this purpose, while the substantive allegations contained in the complaint must be taken as true, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be resolved properly as a class action *. In re Commercial Tissue Antitrust Litig.,* 183 F.R.D. 589, 591 (N.D. Fla. 1998); *In re Linerboard Antitrust Litig.,* 2001 WL 1025390 * 17 (E.D. Pa. 2001).  Federal courts have long recognized the suitability of class actions for pharmaceutical antitrust cases brought against drug

manufacturers. *See, e.g., Cardizem,* 200 F.R.D. at 352; *In re Synthroid Marketing Litig.,* 188 F.R.D. 295 (N.D. Ill. 1999) (certifying class of consumers who purchased Synthroid); *In re Synthroid Marketing Litig.,* 188 F.R.D. 287 (N.D. Ill. 1999) (certifying class of health insurers); *see also Lorazepam, Buspirone.*

To certify a class under Rule 23, Plaintiffs must satisfy each requirement in Rule 23(a), as well as at least one of the separate provisions of Rule 23(b). *Veneman,* 309 F.3d at 792; *Lorazepam,* 202 F.R.D. at 22. As shown below, this action meets all of the requirements of Rule 23(a) as well as the requirements of Rules 23(b)(2) and 23(b)(3).

## C. This Action Satisfies the Requirements of Rule 23(a)

Rule 23(a) provides that in order to proceed as a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Each of these criteria is satisfied here.

### 1. Numerosity is Clearly Present.

The first requirement in maintaining a class action under Rule 23(a) is that the proposed class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Plaintiffs need not prove the exact size of the proposed class, but rather must demonstrate only that the number is sufficiently large so as to make joinder impracticable. *Cardizem,* 200 F.R.D. at 335. "A finding of numerosity may be supported by common sense assumptions, and it is

especially appropriate in antitrust actions brought under Rule 23(b)(3)." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 239 (E.D.N.Y. 1998) (*citing* 4 *Newberg on Class Actions* § 18.03, n. 17 (2d ed.1985)).  Plaintiffs herein have alleged*, inter alia*, violations of the laws of all fifty states, and that the Class includes thousands of members. (Amended Complaint, ¶¶ 61, 62).  Thus, members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. *See, e.g., Vitamins*.

### 2.  Common Questions of Law or Fact Exist.

The second prerequisite is that "there are questions of law or fact common to the class."  Fed.R.Civ.P. 23(a)(2).  "The commonality test is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *Lorazepam*, 202 F.R.D. at 26.[4]  Plaintiffs here raise the following common issues of law and fact:

> a.  whether Defendants combined, agreed, or conspired as alleged herein in restraint of trade;

---

[4]  The commonality and typicality requirements of Rule 23(a) overlap to a great degree and courts often discuss these concepts together. *See, e.g., In re Prudential Ins. Co. of America Sales Practice Litig.,* 148 F.3d 283, 311 (3d Cir. 1998); *Hassine v. Jeffes,* 846 F.2d 169, 176-77 n.4 (3d Cir. 1988); *Williams v. Empire Funding Corp.,* 183 F.R.D. 428,438 (E.D. Pa. 1998) (noting that "Both commonality and typicality serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiffs claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence") (citation omitted). However, there are differences: '"commonality' . . . evaluates the sufficiency of the class itself, [while] 'typicality' . . . evaluates the sufficiency of the named plaintiff." *Hassine*, 846 F.2d at 176-77 n. 4. *See also Bunnion,* 1998 WL 372644 at *4. In the interest of completeness, Plaintiffs discuss commonality and typicality separately herein to demonstrate that each requirement is satisfied here.

      b.      whether Defendants' agreement, combination, or conspiracy was lawful;

      c.      whether Defendants' unlawful conduct as alleged herein has affected interstate commerce;

      d.      whether Defendants monopolized and/or attempted to monopolize the market for Ovcon and generic Ovcon;

      e.      whether Defendants' unlawful conduct caused Plaintiffs and the other members of the Class to pay more for Ovcon than they would have paid absent Defendants' conduct;

      f.      whether Defendants' unlawful conduct caused antitrust injury to the business or property of Plaintiffs and the members of the Class and, if so, the appropriate relief and/or measure of damages; and

      g.      whether Defendants were unjustly enriched.

Amended Complaint ¶ 63.

Such issues have been found to satisfy the commonality requirement in other antitrust cases. *See, e.g., Lorazepam,* 202 F.R.D. at 27, *citing In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269, 273 (D.D.C.1972) (finding commonality where "[e]ach of the class actions allege[d] that the defendants' violations of Sections 1 and 2 of the Sherman Act ha[d] caused the price of ampicillin and other semisynthetic penicillins to be maintained at high, arbitrary and noncompetitive levels throughout the United States, all to the injury of plaintiffs and the particular class members"); *In re NASDAQ Market-Makers Antitrust Litigation,* 169 F.R.D. 493,510 (S.D.N.Y 1996) (stating that "[n]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)" and citing cases).

Moreover, "[i]t is well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." *Cardizem,* 200 F.R.D. at 335, *citing In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 240 (citing cases). Based on the foregoing, the commonality requirement is easily satisfied here.

### 3. The Claims of the Representative Plaintiffs are Typical of the Claims of the Class.

Rule 23(a)(3) requires that the representative plaintiffs' claims be "typical" of the claims of the class. "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." *Cardizem* at 335 quoting *Gen. Tel. Co. v. E.E.O.C.,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). " '[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *Cardizem* at 335 quoting *In re Am. Med. Sys.,* 75 F.3d at 1082 (quoting 1 *Newberg on Class Actions*, § 3-13, at 3-76 (footnote omitted)). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* (*citing* 1 *Newberg, supra*, § 3.13, at 3-75). Courts considering this prerequisite have observed that "claims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices." *Cardizem* at 335 quoting *In re Playmobil*

*Antitrust Litig.,* 35 F.Supp.2d at 241 (*citing In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D.Minn.1995)).

Here, as in other antitrust price-fixing cases, Plaintiffs' claims and the claims of the absent class members arise from the same events, involve the same legal theory, and the same elements of proof.   Therefore, the interests of the class representatives and the absent class members are sufficiently aligned. "Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification." *Cardizem* at 335 quoting  *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 242.  In this case, plaintiffs' claims arise from the same conduct giving rise to the claims of the respective class, and the relief plaintiffs seek is common to the Class.  *Cardizem,* 200 F.R.D. at 335; *In re Playmobil Antitrust Litig.,* 35 F. Supp. 2d 231, 241-42 (E.D.N.Y. 1998).  As a result of Defendants' unlawful monopolization and attempted monopolization of the market for Ovcon through the illegal horizontal agreement, Plaintiffs and the Class members paid supra-competitive prices.  *See* Amended Complaint ¶ 60, *et seq.* These allegations, which must be accepted as true for purposes of class certification, demonstrate that Plaintiffs' claims are typical of the claims of all Class members in satisfaction of Rule 23(a)(3).[5]

Each of the individual and third-party payor class members has performed a single, uniform function at the crux of this class action: they have all paid supra-

_____

[5]      *See, e.g., In re Potash Antitrust Litig.,* 159 F.R.D. 682, 690 (D. Minn. 1995) ("a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences"); *In re Aluminum Phosphide Antitrust Litig.,* 160 F.R.D. 609, 613 (D. Kan. 1995) ("typicality element requires that representative plaintiffs possess the same interest and suffer the same injuries as proposed class members*"); In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1035 (N.D. Miss. 1993) ("a claim by a representative party may be deemed 'typical' if it is one which should be 'reasonably expected' to be raised by members of the proposed class").

competitive retail prices for Ovcon. In some instances, either the consumer or the third party payor has paid the entire amount of the prescription; at other times the consumer has paid a portion and the third-party payor has co-paid a portion. As individuals and entities that have all paid for these drugs, the class representatives and the members of the Class all share one critical and material fact in common - they all overpaid for Ovcon as a result of defendant's anticompetitive behavior.

### 4. The Representative Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This prerequisite requires that the Court examine such factors as the quality of class counsel, the existence of any adverse interests between class representatives and other class members, communication between class counsel and the class, and the overall context of the litigation. *See Kifalfi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 177(D.D.C.1999) (*citing Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C.Cir.1997)).

As demonstrated by the firm resume attached as Plaintiffs' Exhibit "A," counsel for the Plaintiffs have successfully litigated numerous class actions and other complex cases on behalf of consumers. Clearly, Plaintiffs' counsel are experienced trial lawyers who will vigorously and adequately represent the classes.

Similarly, the representative plaintiffs will fairly and adequately represent the classes. The representative plaintiffs and each member of the proposed

Classes share the identical objectives of establishing liability and obtaining damages and restitution. No conflict of interest exists as to either of these goals as all plaintiffs will desire to recover as damages that portion of the overpayment that is attributable to their payments. Accordingly, the adequacy requirement of Rule 23(a)(4) is fully satisfied.

### D.  This Action Fulfills the Requirements of Rule 23(b)(2).

In addition to their claims for damages, Plaintiffs also request an injunction against Defendant's anticompetitive conduct.[6] *See* Amended Complaint Counts I and II. Rule 23(b)(2) provides for class certification when the defendant has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  *Baby Neal For and By Kanter v. Casey,*  43 F.3d 48, 58. (3rd Cir. 1994).  "Courts have certified antitrust class actions both under Rule 23(b)(2) and (b)(3) if the requirements of each rule are satisfied." *See also NASDAQ,* 169 F.R.D. at 515 ('Nothing in the language of Rule 23 precludes certification of both an injunctive class and a damages class in the same action. In fact, where injunctive relief and damages are both important components of the relief requested, court[s] have regularly certified an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3) in the same action.") (*citing Davis v. Southern Bell Tel. & Tel. Co.,* 1993 WL 593999, *5 (S.D. Fla. 1993)).

---

[6] Indirect purchasers have standing to seek an injunction under the Clayton Act.  See *In re Warfarin Sodium Antitrust Litig,* 214 F.3d 395, 402 (3d Cir. 2000).

For the purpose of determining whether the proposed class should be certified under Rule 23(b)(2), there are two factors that must be present: (1) the defendant's action or refusal to act must be "generally applicable to the class"; and (2) plaintiffs must seek final injunctive relief or corresponding declaratory relief on behalf of the class. 7AA Wright, Miller & Kane, Federal Practice & Procedure § 1775 at 41; *Bynum v. District of Columbia*, 217 F.R.D. 43, 48 (D.D.C.2003).

Here, plaintiffs have satisfied both factors.  First, the anticompetitive horizontal agreement between Defendants, which prevents Defendant Barr from selling its generic version of Ovcon 35 until 2009, is an action by Defendants that is "generally applicable to the Class."[7]  The second requirement is also clearly met since Plaintiffs on behalf of themselves, and members of the Class have requested declaratory and injunctive relief in their Amended Complaint.  *See* Amended Complaint "Prayer for Relief," pp. 17 and 18.

Furthermore, plaintiffs and the Class members will benefit from relief designed to assure defendant's compliance with the applicable standards. Because this action challenges conduct generally applicable to the Class and because the Court can enter appropriate equitable and declaratory relief, this action patently satisfies the (b)(2) standard.  If Plaintiffs prove their case, they are entitled not only to damages for the excessive prices they have already paid

---

[7] "An inquiry into whether the defendant acted on grounds generally applicable to the 23(b)(2) class is often considered to be encompassed by the commonality requirement of Rule 23(a), which the court has already found to have been met." *Does I through III v. District of Columbia*, 232 F.R.D. 18, 28 fn. 12 (D.D.C. 2005) citing *Diaz v. Hillsborough County Hospital Authority*, 165 F.R.D. 689, 695 (M.D.Fla.1996); *Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24, 45-46 (N.D.Cal.1977)

(which is the subject of the Rule 23(b)(3) class), but also to an injunction preventing Defendant from engaging in the same unlawful techniques to acquire and maintain a future monopoly. *Davis v. Southern Bell Tel. & Tel. Co.,* 1993 WL 593999, *7 (S.D. Fla. 1993). Defendant's continuing unlawful acts of monopolization and attempted monopolization certainly threaten continuing harm to all Class members. See *NASDAQ,* 169 F.R.D. at 516 ("Unless enjoined and made subject to equitable relief, Defendants' alleged conspiracy will continue to inflate spreads for the benefit of Defendants and to the detriment of the Class."); *In re Warfarin Sodium Antitrust Litigation,* 214 F.3d 395, 402 (D.Del. 2000) ("Unless enjoined, DuPont's unlawful conduct will continue unchecked and the class will continue to bear the financial brunt of the antitrust violations.").

In sum, as the injunctive relief sought by Plaintiffs is an important aspect of the case, the Court should certify the Class pursuant to Rule 23(b)(2) as well as Rule 23(b)(3).

### E. **This Action Fulfills the Requirements of Rule 23(b)(3).**

The Court's task under Rule 23(b)(3) is to determine whether common questions of law or fact predominate over individual ones and whether the proposed class action is superior to other available methods of adjudication. "[T]he Court must scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 684 (N.D.Ga.1991).

#### 1. **Predominance**

"There are no bright lines for determining whether common questions

predominate.   Instead, considering the facts of the case presented, a claim will

meet the predominance requirement when there exists generalized evidence

which proves or disproves an element on a simultaneous, class-wide basis, since

such proof obviates the need to examine each class member's individual position.

Common questions need only predominate:  they need not be dispositive of the

litigation."  *In re Potash Antitrust Litig.,* 159 F.R.D. at 693 (internal citations

omitted).  "The predominance requirement is satisfied unless it is clear that

individual issues will overwhelm the common questions and render the class

action valueless."  *In re NASDAQ,* 169 F.R.D. at 517.

### a. The Elements of Plaintiffs' Monopoly Claims and Required Proof are Common and Predominate.

A federal or state antitrust monopoly claim generally has the following

elements: (1) the possession of monopoly power in the relevant market and (2)

the willful acquisition or maintenance or use of that power by anti-competitive or

exclusionary means.  *Cardizem,* 200 F.R.D. at 331; *Chase v. Northwest Airlines

Corp.,* 49 F. Supp. 2d 553, 565 (E.D. Mich. 1999*).  See also U.S. v. Grinnell,* 384

U.S. 563, 570-71 (1966).[8]  All proofs relative to monopolization are common to

plaintiffs and the members of each class and predominate over any individual

questions.

The first element of monopolization - monopoly power - is "the power to

control market prices or exclude competition."  *Handicomp, Inc. v. United States*

---

[8]    Each of the indirect purchaser state antitrust statutes prohibiting illegal monopolies and attempts to monopolize have the same essential elements as federal claims for violations of Section 2 of the Sherman Act.  In fact, in interpreting equivalent state antitrust statutes, courts either follow federal Sherman Act precedent, find federal caselaw persuasive, or both. *See, e.g., In re Cardizem CD Antitrust Litig.,*105 F. Supp.2d 682, 692-693 & n.6 (collecting cases).

*Golf Ass'n.,* 2000 WL 426245 (3rd. Cir. 2000) (*citing United States v. E.I. du Pont de Nemours & Co.,* 351. U.S. 377, 391 (1956)).  A precondition to characterizing a defendant as a monopolist is demonstrating the scope of the relevant market. Plaintiffs and the class members have alleged that the proper relevant market is the United States (Counts I, II and IV) and the Indirect Purchaser States market (Count III) for the manufacture and sale of Ovcon 35 and its generic bioequivalents.  (Amended Complaint ¶61.) This definition is common to Plaintiffs and the Class and itself satisfies the commonality requirement:

> [T]he monopolization and attempted monopolization charges set forth in count two of the complaint also raise significant common questions. For example, the monopolization claim raises the question of the proper relevant market. Plaintiffs allege that the appropriate product market is Mobil gasoline, while Mobil contends that the relevant product market should encompass all brands of gasoline. Clearly this is a question common to all members of the putative class, the resolution of which will affect the entire class.

*Jennings Oil Co.. Inc. v. Mobil Oil Corp.,* 80 F.R.D. 124, 129 (S.D.N.Y. 1978). *See also Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791,794 n. 6 (10th Cir. 1970) (relevant market determination is a common issue for the class). *Cf. City of New York v. General Motors Corp.,* 60 F.R.D. 393,395 (S.D.N.Y. 1973), *appeal dismissed,* 501 F.2d 639 (2d Cir. 1974) ("It is my view that the common underlying issue of liability pursuant to an unlawful, nationwide monopoly predominates over any questions as to the varying nature or amount of damages.").

The second element of a monopolization claim is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development

as a consequence of a superior product, business acumen, or historic accident."
*Grinnell*, 384 U.S. at 570-71. This element is met when the monopolist "impaired
competition in an unnecessarily restrictive way."  *Aspen Skiing Co. v. Aspen
Highlands Skiing Corp.,* 472 U.S. 585, 605 (1985).  Furthermore, "[w]here a
defendant maintains substantial market power, his activities are examined
through a special lens:  Behavior that might otherwise not be of concern to the
antitrust laws - or that might even be viewed as procompetitive - can take on
exclusionary connotations when practiced by a monopolist."  *Eastman Kodak Co.
v. Image Tech. Servs.,* 504 U.S. 451, 488 (1992)  (*citing* 3 P. Areeda & D. Turner,
Antitrust Law, ¶ 813, at 300-02 (1978)).

     Many courts have held that impact can be presumed upon proof of a
conspiracy.  Linerboard 203 F.R.D. at 217 quoting *Lumco Indus., Inc. v. Jeld-
Wen, Inc.,* 171 F.R.D. 168, 172 (E.D.Pa. 1997); *In re Citric Acid Antitrust Litig.,*
1996 WL 655791, *7 (N.D.Cal 1996); *In re Sugar Indus. Antitrust Litig.*, 1976 WL
1374, *24 (N.D. Cal 1976); 4 *Newberg on Class Actions*, § 18.28 ("As a rule, the
allegation of a price-fixing conspiracy is sufficient to establish predominance of
common questions.").  This is such a case.

### b.  Common Evidence of Impact Exists on a Class-Wide Basis

     "If generalized evidence exists which will prove or disprove this injury
element on a simultaneous class-wide basis, then there is no need to examine
each class member's individual circumstance. . ."  *Cardizem* at 339.  *See also
Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114, n. 9, 89 S.Ct.
1562, 23 L.Ed.2d 129 (1969) (observing that the antitrust plaintiff's "burden of

proving fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.").  To show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member.   *See In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 618 (N.D.Ga.1997) (observing that "Plaintiffs must show that antitrust impact can be proven with common evidence on a class-wide basis;  Plaintiffs need not show antitrust impact in fact occurred on a class-wide basis").

As in other previous pharmaceutical antitrust cases, fact of damage, or antitrust "impact," will be demonstrated here using evidence and methods that are entirely common to the Class. [9]  Here, Plaintiffs intend to prove class-wide impact in the form of "overcharges" - the difference between the price that was actually paid and the price that would have been paid had the anticompetitive

---

[9]      *Lumco Industries, Inc. v. Jeld-Wen, Inc.,* 171 F.R.D. 168, 173-74 (E.D. Pa. 1997) ("At this stage of the litigation, however, the Court need not concern itself with whether plaintiffs can prove their allegations regarding common impact; the court need only assure itself that plaintiffs' *attempt* to prove their allegations will predominantly involve common issues of fact and law.") (emphasis added). *See Linerboard,* 2001 WL 1025390,* 23 ("For purposes of class certification, the Court concludes that plaintiffs have presented a viable method for proving class-wide impact. At this point of the litigation, it would be improper to make a determination as to the likely success of using one of the identified methods"); *In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 531 (M.D. Fla. 1996) ("Plaintiffs have demonstrated at least a 'colorable method' of proving impact at trial.  That Defendant's expert disagrees with the methodology and conclusions propounded by [plaintiffs' expert] is not a reason to deny class certification. Whether or not plaintiffs will be successful in persuading the jury that there has been a common impact remains to be seen"). *See also In re Independent Gasoline Antitrust Litig.,* 79 F.R.D. 552, 561 (D. Md. 1978) ("Assuming plaintiffs are able to develop statistical proof of impact, the strength or weakness of such proof is for the jury to decide"); *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 266 (E.D. Mich. 1997) ("While plaintiff may ultimately fail to prove defendants' actions were illegal, or fail to prove any effect on prices, all of these are merits questions that should not affect the class certification question").

conduct not occurred.  *See, e.g., Cardizem,* 200 F.R.D. at 309-14."[10]  The

*amount* of the total overcharge, *i.e.*, damages, is irrelevant to proving the *fact* of

antitrust impact, as long as the common evidence shows that there is *some*

overcharge.  *Zenith Radio Corp., 395* U.S. at 114 n9 (1969*)*.

    Plaintiffs are not required, in the context of a motion for class certification,

to prove that class members actually suffered antitrust impact.  Rather, for

purposes of class certification, "the court need only find that plaintiffs have

identified a valid method far determining impact" on a class-wide basis.

*Linerboard,* 203 F.R.D. at 220; *Cardizem,* 200 F.R.D. at 307.  In other words,

Plaintiffs need not make a threshold showing that prices were actually higher

than they would have been but for Defendants' conduct; or that the entry of

generic Ovcon 35 would, in fact, have resulted in lower prices (though Plaintiffs'

evidence, and Dr. Heiden's analysis, support both of these points with largely

irrefutable common evidence).  Those are merits issues.  Rather, Plaintiffs need

only present a *method of proof* that is predominantly common.

    In overcharge cases such as this one, impact may be proven on a class-

wide basis if common evidence or methodologies exist for demonstrating

widespread impact to the class.[11]  In cases alleging a nationwide conspiracy to

---

[10]    See *also In re LowerLakeErie Iron Ore Antitrust Litig., 998* F.2d 1144 (3d Cir. 1993)
(direct purchaser prevented from purchasing a different but cheaper substitute product due to an
antitrust violation may seek to recover the difference in price as an overcharge); *Lee-Moore Oil
Co. v. Union Oil* Co.. *599* F.2d 1299,1306 (4th Cir. 1999) (same); *Chazlanoogn Foundry* & *Pipe
Works v. Allanta, 203* U.S. 390, 396 (1906); In re ABA Section of Antirust Law. Proving Antitrust
Damages: Legal and Economic Issues, "Antitrust Digest" Ch. *6,* "Overcharges" at 172 (1996)
("Antitrust Damages").

[11]    Even if it could be shown that some individual class members were not injured, class
certification, nevertheless, is appropriate where the antitrust violation has caused widespread
injury to the class." *NASDAQ*, 169 F.R.D. at 523. *See also Cardizem.* 200 F.R.D. at 320-21
("Even if Plaintiff could not show injury-in-fact as to a few class members, this would not be

fix prices or allocate markets, common impact is generally established - or may even be presumed - because such an overarching conspiracy will invariably inflate the prices paid by all direct purchasers.  "[A]s a general rule, an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market."  *In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162, 166 n.13 (S.D.N.Y. 2000) *quoting In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327 (E.D.N.Y. 1982).[12]

In his Declaration, Dr. Heiden has identified three main types and methods of proof, each involving entirely class-wide evidence:  1.) Economic studies by government and economic researchers; 2.) Pricing and sales data from IMS Health; and 3.) Projections and models developed by Defendants.  *Heiden Decl.* at 22-31.

### 1)  Economic studies by government and economic researchers

In his Declaration, Dr. Heiden stated that "numerous economic studies exist by government and academic researchers on many categories of prescription drugs that establish the impact that generic entry has on brand sales, and on the cost of the drug at issue.  These studies provide a road map as to how economic damages occur from the prevention of generic entry.  They also supply common evidence that may be used to gauge the impact and damages to

---

fatal."); *In re Northwest Airlines Corp. Antitrust Litig.,* 208 F.R.D. at 174-75 (E.D. Mich. 2002) ("[i]t is not necessary, at the class certification state, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry").

[12]       *Auction Houses,* 193 F.R.D. at 166 ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *NASDAQ,* 169 F.R.D. at 523 (facts of price fixing or market allocation will tend to show each member of class was injured). *See also Linerboard,* 203 F.R.D. at 217 (collecting cases).

the entire Class of Ovcon-35 purchasers." *Heiden Decl.* ¶ 22.[13]  Dr. Heiden

further stated:

> These studies include published and unpublished government and
> proprietary studies, academic research articles and policy papers,
> dissertations, and other sources describing the effects of generic
> competition.  Although they do not all use identical methodological
> approaches or data sources and time periods, these studies come
> to the same principal conclusions:  (1) prices of generics are
> substantially lower than those for brand name drugs; (2) after
> generic entry, a significant share of the market is obtained by the
> generic manufacturer(s) over a relatively short period of time, most
> of which is caused by purchasers who substitute generic for brand
> product.  *See, e.g., Congressional Budget Office (1998), Ellison et.
> al. (1997), Frank and Salkever (1997), Grabowski and Vernon
> (1996), Rozek and Berkowitz (1999), Saha et. al. (2006), and Suh
> et al. (2000).*

*Heiden Decl.* ¶ 23.

### 2)  Projections and models developed by Defendants

Additionally, Defendants' projections and, more importantly, underlying

models, data and assumptions, provide a basis for establishing the harm done to

members of the Class of Ovcon-35 purchasers from delayed generic entry.

*Heiden Decl.* ¶ 28.  Dr. Heiden observed:

**REDACTED**

*Heiden Decl.* ¶ 30.

---

[13]    *Congressional Budget Office on Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical industry, at* 32,(July *1998), available at* http:www.cbo.gov/ftpdocs/6xx/doc65S/pham.pdf.

Similarly, Warner Chilcott's own internal documents projected the impact of generic entry:

**REDACTED**

*Heiden Decl.* ¶ 27.

Again, this evidence predominates and can be applied class-wide.

### 3) Pricing and sales data from IMS Health

Dr. Heiden has concluded that "[c]ommon evidence the impact of generic competition on the market can also be shown using pricing and sales data from IMS Health, a leading source of marketplace information on prescription drugs. IMS Health data can be used to compare the experience of Ovcon-35 with that of oral contraceptives that have faced generic competition." *Heiden Decl.* at 26. The type of evidence is precisely the kind of common evidence that other courts in nearly identical cases have found sufficient to satisfy the plaintiffs' burden at the class certification stage. *See, e.g., Cardizem,* 200 F.R.D. at 308.

Simply stated, proof of antitrust impact here will be accomplished through evidence and expert analysis that predominates and can be applied class-wide.

### c.  Class-Wide Methodologies Are Available For Estimating Impact and the Amount of Damages

Plaintiffs' burden with respect to damages at the class certification stage is a "limited" one.  *Cardizem,* 200 F.R.D. at 321.  No precise damage formula must be shown; indeed, Plaintiffs need not choose any one methodology now, as long as a generally accepted method is offered.  *See Linerboard,* 203 F.R.D. at 217-19; *NASDAQ,* 169 F.R.D. at 522 ("The Court need not decide at this juncture what approach is best suited to the particularities of this case. It is sufficient to note at this stage that there are methodologies available.").  Even if some individual questions exist pertaining to damages, that will not affect class certification. See, *e.g., Bogosian,* 561 F.2d at 456; *NASDAQ,* 169 F.R.D. at 524; *Jack Faucett Assoc. v. American Tel.* & *Tel.* Co., No. 81-1804,1983 WL4601 at *3 (D.D.C.  1983).

Plaintiffs' expert, Dr. Heiden, states that he can use the yardstick method to reliably estimate damages in the aggregate for the class as a whole, using the same types of common evidence that can be employed to demonstrate the fact of antitrust injury.  This same methodology has been approved the court in other pharmaceutical cases such as *Cardizem* and *Remeron.*  Specifically, Dr. Heiden stated that the following class-wide methodology for estimating damages was available:

> Aggregate damages to indirect purchasers of Ovcon-35 can be reliably calculated from these benchmarks using the following approach.  First, the generic substitution curve would be estimated in a "but-for" world.  This generic substitution curve would be used to project "but-for" prices, market shares, and total sales for the generic version of Ovcon-35 during the entire damage period, which would include both the five-year period during which entry

was proscribed by the anti-competitive agreement and during any subsequent period in which the share of generic sales is projected to remain lower than it would have been absent the anti-competitive agreement.  The "but-for" prices for branded Ovcon-35 would be estimated using a pricing model developed from published research and analysis of price data for other branded drugs facing generic competition, the market experience of other oral contraceptives, and Defendants' own data and projections. These prices and quantities can be used to calculate the total amount consumers would pay for the branded and generic versions of Ovcon-35 in the absence of the anti-competitive agreement.  All of the methods, modeling procedures and data required to perform this analysis are common to all members of the Class.

*        *        *        *

Aggregate damages to all indirect purchasers are equal to the difference between the amount paid in the "but-for" case and the total amount projected in the "actual" case in which generic entry by Barr is proscribed for the five-year term of the anti-competitive agreement and during any subsequent period in which the share of generic sales is projected to remain lower than it would have been absent the anti-competitive agreement.  Dollar sales and prices reported by IMS Health and already produced in discovery by Warner Chilcott would be used for the portion of the damage period that has already occurred.  Future prices and sales in the "actual" case would be calculated from past trends in Ovcon-35 pricing and sales, pricing and sales data for other oral contraceptives that have not faced generic competition, and Defendants' marketing plans and projections.  All of the methods, modeling procedures and data required to perform this analysis are common to all members of the Class.

*        *        *        *

Additional calculations will be required to determine the extent of the overcharges specifically born by consumers who pay cash and by those who are partially reimbursed by third-party payers. The amount of overcharges paid by members of the Class—consumers purchasing Ovcon-35 for personal use—can be calculated using national and state-level data from IMS Health that report the amounts paid in cash and through third-party payment systems for Ovcon-35 prescriptions.  Damages to class members are equal to the overcharge amounts paid by consumers who pay cash for their prescriptions plus the increase in co-payments required of those who are covered by third-party payers.  The required data on the

28

co-payments made by Class members for purchases made under third-party health plans are also available from IMS Health.  Once again, all of the methods, modeling procedures and data required to perform this analysis are common to all members of the Class.

*        *        *        *

Once these calculations are completed on a national level to determine the aggregate amount of overcharges born by Class members, the state-level data from IMS Health can be used to calculate the amount of these overcharges paid by consumers in each of the states identified in the Complaint as "indirect purchaser states".  These methods and data used to perform these calculations must necessarily be common to all Class members to ensure that the sum of all estimated overcharges at the state level are consistent with the aggregate overcharges estimated at the national level.

*Heiden Decl.* ¶¶ 32-35.

Courts have approved the use of an aggregate damages model in cases exactly like this one - *i.e.,* where a plaintiff alleges overcharges caused by defendants' illegal delay of competition from generic versions of prescription drugs.  *See, e.g., Cardizem, 200* F.R.D. at 324 (concluding that the use of an aggregate approach to measure class-wide damages is appropriate"); *see also Buspirone,* 210 F.R.D. at 57.  Moreover, for purposes of class certification, "it is not necessary to identify specific benchmarks or methodology to ascertain the amount of damages," but rather, it "is sufficient to note at this stage that there are methodologies available." *Cardizem,* 200 F.R.D. at 321-22.

Simply stated, Dr. Heiden's Declaration and the evidence cited therein establish that, at the appropriate stage of this litigation, the amount of damages can be reliably estimated using predominantly common methodologies, formulae and evidence.

### d. The Elements and Proof of State Law Claims of Unjust Enrichment are Common and Predominate.

Plaintiffs and the Nationwide Unjust Enrichment Class are aligned in an attempt to show that defendant violated the antitrust laws and unjustly enriched itself to Plaintiffs' detriment.  Plaintiffs and the Nationwide Unjust Enrichment Class will show that Defendants were enriched by illegal overcharges and that equity requires disgorgement of the benefit unlawfully reaped through its unlawful and inequitable conduct.

Unjust enrichment claims are asserted by the Nationwide Unjust Enrichment Class. Amended Complaint, ¶¶ 61, 100-105.  Plaintiffs' claims for unjust enrichment are uniformly recognized throughout the states, and are susceptible to common proof.[14]  Remedies for unjust enrichment in the form of restitution are likewise uniform.  A detailed description of this common uniform proof is set forth in Dr. Heiden's Affidavit:

> Finally, once the amount and time-profile of the economic impact imposed on Ovcon-35 consumers from the delayed entry of generic substitutes is assessed, a common methodology and data can, and should, be used to calculate the extent to which these overcharges have unjustly enriched Defendants.  Unjust enrichment is calculated as the excess, or incremental, profits accruing to Defendants in the "actual" case in which generic entry is forestalled, relative to the profits that would have been earned in the "but-for" case in which generic entry takes place at the beginning of the damage period.

---

[14]    The law of unjust enrichment is simply stated: "a person who is unjustly enriched at the expense of another is liable in restitution to the other." Restatement (Third) of Restitution, 51 (Draft 2000).  The simplicity and clarity of the Restatement accurately conveys the law throughout the United States. The typical elements of an unjust enrichments claim are three: (1) the plaintiffs conferred a benefit upon the defendant; (2) the defendant accepted and retained this benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit." *Cardizem,* 105 F. Supp.2d at 671 (*quoting Ravavort v. U.S. Dept. of Treasury,* 59 F. 3d 212,218 (D.C. Cir. 1995)).

\*     \*     \*     \*

Calculating excess profits requires estimation of the costs that would have been incurred in achieving the sales revenues projected in the "but-for" and "actual" cases, respectively. This will require analysis of Warner Chilcott's wholesale pricing, including discounts, rebates, and free samples, as well as of the company's production, sales, and promotion costs. These pricing and cost data are largely available from materials and computer worksheets already produced by Defendants in discovery.

\*     \*     \*     \*

The calculation of excess profits will require adjustments to take into account the impact of generic competition on Defendants' pricing strategies and promotional activities. While I have not yet performed this analysis, it would be reasonable to expect based on the studies cited above and data from other drugs facing generic competition that the level of discounts and rebates would increase in the "but-for" case and the amounts expended for various types of promotional costs would decline. The excess profit calculations, and the procedures used to estimate impact of these and other factors on the levels of excess profits earned, are common to all members of the Class.

*Heiden Aff.,* ¶¶ 36-38.

Restitution is the remedy for unjust enrichment. A claim for restitution is uniformly recognized throughout the country. *See generally* Restatement *of the Law of Restitution* (Draft 2000). If Plaintiffs prove their case, the restitution remedy will be the same for the entire Nationwide Unjust Enrichment Class. The measure of unjust enrichment is common, and the appropriate recovery is clear. Each class member is entitled to be compensated for the amount that the class member overpaid for Ovcon 35. *Cardizem,* 105 F. Supp. 2d at 668-671 (amount that plaintiffs overpaid for prescription drug may be recovered in restitution action as representing the benefit that it would be unjust for defendants to retain).

In sum, the predominance requirements of Rule 23(b)(3) are satisfied.

### 2. Class Treatment is Superior.

In addition to the predominance of common questions, Rule 23(b)(3) requires that the Court determine that the class action device is superior to other available methods for the fair and efficient adjudication of these controversies. Considerations of judicial economy and access to justice underscore the superiority of the class action in this case. Class members' individual claims are relatively small when measured against the prohibitive cost of prosecution of this type of complex litigation, and a class action stands as the only practical method by which the vast majority of plaintiffs and members of the Class can litigate their claims against defendant. *See, e.g., In re Synthroid*, 188 F.R.D. at 302. Abandonment of the plaintiffs and the Class' claims would, of course, run counter to the public policy embodied in the state statutes and presumably leave the defendant in possession of unlawful profits. *See In re Folding Carton Antitrust Litig.,* 75 F.R.D. 727,733 (N.D. Ill. 1977) (class actions "reinforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement").

Plaintiffs are aware of no insurmountable management difficulties that will be encountered in the litigation on behalf of the Class. Difficulties in management of class actions are significant only if they make the class action less fair and efficient than other available techniques. *In re Domestic Air Trans. Antitrust Litig.,* 137 F.R.D. 677, 693 (N.D. Ga. 1991). *See also Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 1994 U.S. Dist. LEXIS 12652 at *8 (N.D. Cal. Sept. 2, 1994) ("Despite the complexity of determining individual damages, other methods of

adjudicating this controversy would appear to be even more complex and less efficient").  If the Class is indeed large, management should not be any more difficult than other complex class litigation.  In *Domestic Air,* 137 F.R.D. at 694, for example, a class consisting of at least 12.5 million people and 400 million transactions was certified.  *See also Disposable Contact Lens,* 120 F.R.D. 524 (class of up to 18 million replacement contact lens purchasers); *Appleton Electric Co. v. Advance United Expressways,* 494 F.2d 126 (7th Cir. 1974) (a several million member plaintiff class and thousand-plus member defendant class); *NASDAQ,* 169 F.R.D. at 528 (". . . the size of the class militates in favor of, not against, class certification").

When and how to deal with individualized issues of damages is a question of case management.  *In re Plywood Antitrust Litig.,* 76 F.R.D. 570,585 (E.D. La. 1976).  A multitude of approaches is available to the Court. *See 1 Newberg on Class Actions* § 4.26 at 4-91-97; *Potash Antitrust Litig.,* 159 F.R.D. at 698 ("various judicial methods are available to resolve individual damage issues" including "bifurcating liability and damages," "appointing special masters," or "using defendants' transactional records").  Thus, it will be feasible in each class case to establish all liability issues and the aggregate class damages in a single trial.  In *In re Antibiotics Antitrust Actions* 333 F. Supp. At 281, plaintiffs alleged price fixing in the sale of antibiotic drugs to millions of consumer class members.  Defendants contended that individual issues of damages were predominant and that the case was unmanageable. 333 F. Supp. at 281.  The court certified the

class, concluding that the amount of damages could be determined on a

classwide basis, because:

> It is far simpler to prove the amount of damage to the members of
> the class by establishing their total damages than by collecting and
> aggregating individual damage claims as a sum to be assessed
> against the defendants. And it is the court's tentative conclusion
> that this can be done without sacrificing the rights of the defendants.

333 F. Supp. at 281.[15]

The leading treatise on class actions likewise notes the advantage and

viability of proving aggregate class damages:

> In many cases, the class representative in an antitrust suit may
> prove the amount of damages for the entire class . . . thus
> eliminating the need for individual damage proofs during trial. This
> approach allows the named plaintiff to show the total class
> damages caused by the defendant's unlawful conduct.

H. Newberg & A. Conte, *Newberg on Class Actions*, § 18.53, pp. 18-162-63 (3d

ed. 1992).

The aggregate class damage approach has obvious case management

advantages. By eliminating individual damage proofs at trial, the length,

complexity and attendant costs of litigation are greatly reduced. Again, as noted

in Newberg:

> Aggregate computation of class monetary relief is lawful and proper.
> Challenges that such aggregate proof affects substantive law and
> otherwise violates the defendant's due process or jury trial rights to
> contest each member's claim individually, will not withstand
> analysis.

---

[15]     The court in *In re Antibiotics Antitrust Actions* envisioned that the determination and allocation of individual damages would occur in an administrative process, rather than in a second trial phase: "Damages would be awarded on a class-wide basis, if and when liability was established, and individual claims could then be processed administratively after entry of judgment." 333 F. Supp. at 283. In a subsequent opinion, the Court followed up on its tentative decision that the class would be manageable by finding, on a more developed record, that the class in fact was manageable. *Id.* at 291.

*Id.* at § 10.05.

## IV.    <u>CONCLUSION</u>

Accordingly, for the foregoing reasons, this Court should enter an order

granting Plaintiffs' motion for class certification.

Dated:  July 28, 2006

Respectfully submitted,


/s/ John M. Mason
John M. Mason, Esquire
DC Bar ID#: 193268
Of Counsel
**LAW OFFICES OF ROBERT W. SINK**
319 West Front Street
Media, PA 19063
Tel:    610-566-0800
Fax:    610-566-4408

Robert W. Sink, Esquire
*Pro Hac Vice*
**LAW OFFICES OF ROBERT W. SINK**
319 West Front Street
Media, PA 19063
Tel:    610-566-0800
Fax:    610-566-4408

***Attorneys for Plaintiffs***