## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEPHANIE COHEN and SUNDA CROONQUIST, individually and on behalf of all others similarly situated,** ) ) ) ) | |
| **Plaintiffs,** ) | |
| **v.** ) | Civil Action No: 1:06CV00401 (CKK) |
| ) | Jury Trial Demanded |
| **WARNER CHILCOTT PUBLIC LIMITED COMPANY, WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., GALEN (CHEMICALS), LTD., and BARR PHARMACEUTICALS, INC.,** ) ) ) ) ) ) ) ) ) | |
| **Defendants.** ) ) | |

**CONSUMER PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT, CONDITIONAL CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS, APPOINTMENT OF PLAINTIFFS' COUNSEL AS CLASS COUNSEL, AND APPROVAL OF THE FORM AND MANNER OF GIVING NOTICE TO THE SETTLEMENT CLASS**

## I.    INTRODUCTION

On May 16, 2007, Plaintiffs, Stephanie Cohen and Sunda Croonquist, individually and on

behalf of all others similarly situated ("Plaintiffs"),[1] and Defendants, Warner Chilcott Public

Limited Company, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation,

Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., Galen (Chemicals), Ltd. (together

---

[1] Unless otherwise noted, terms used herein are used as defined by the Settlement Agreement signed by the parties, attached hereto as Exhibit A.

"Warner Chilcott") and Barr Pharmaceuticals, Inc. ("Barr") entered into a Settlement Agreement

in the above-captioned consumer class action (the "Consumer Action"). Pursuant to the

Settlement Agreement (Exhibit "A"), Warner Chilcott and Barr will each donate $3,000,000

worth of combined hormonal contraceptive products throughout the United States to (1) primary

care physicians not currently receiving samples of the donated products who prescribe combined

hormonal contraceptives, (2) university health centers or clinics, or (3) charitable organizations

providing reproductive healthcare services to women, for a total product donation with a retail

value of $6,000,000. Warner Chilcott and Barr have also agreed to pay $1,000,000 each, for a

total value of $2,000,000, into a fund which, subject to Court approval, will be used to pay

reasonable attorneys' fees and expenses incurred by Plaintiffs' counsel and any incentive awards

to the named Plaintiffs. Warner Chilcott and Barr shall not object to Plaintiffs' counsels' request

for attorneys' fees and reimbursement of expenses up to $2,000,000 or to incentive awards up to

$7,500 per named Plaintiff. Additionally, Warner Chilcott and Barr have agreed to pay $150,000

each, for a total value of $300,000, into a fund which, upon preliminary Court approval, will be

used to provide notice to the Settlement Class and pay for any notice administration expenses.

This settlement is the result of arms-length negotiations spanning several months that

included the assistance of Magistrate Judge Alan Kay. Prior to reaching the Settlement

Agreement, extensive discovery (including over twenty depositions and production of Plaintiffs'

expert's declaration) and briefing (including Defendants' Joint Motion to Dismiss Plaintiffs'

Amended Complaint, Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to

Dismiss, and Plaintiffs' Motion for Class Certification) had occurred, allowing the parties to

meaningfully assess the strengths and weaknesses of their positions. Accordingly, Plaintiffs

request (i) preliminary approval of the Settlement Agreement, (ii) conditional certification of the

proposed Settlement Class, (iii) appointment of Plaintiffs' counsel as Class Counsel, (iv)

approval of the form and manner of giving notice of this settlement to the Settlement Class, and

(v) the scheduling of a hearing to determine whether this settlement warrants final approval.

## II.    BACKGROUND

### A.    The Litigation

On April 19, 2006, the Consumer Plaintiffs filed an Amended Class Action Complaint

alleging that Defendants had participated in an unlawful conspiracy to restrain trade in which Barr

agreed not to market a generic version of Warner Chilcott's Ovcon 35 in exchange for payments

from Warner Chilcott.  Plaintiffs asserted that Defendants' conduct was in violation of Sections 1

and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, the antitrust and/or consumer protection statutes of

the "Indirect Purchaser" states, and the unjust enrichment laws of the fifty states.  On May 5, 2006,

Defendants filed a Joint Motion to Dismiss Plaintiffs' Amended Complaint.  On May 19, 2006,

Plaintiffs filed a Memorandum in Opposition to Defendants' Joint Motion to Dismiss.  On June 1,

2006, Defendants filed a Joint Reply in Support of their Motion to Dismiss Plaintiffs' Amended

Class Action Complaint.  Extensive discovery took place in this action and the related actions

brought by the FTC, thirty-four States and the District of Columbia, direct purchasers and third

party payors involving the same conduct at issue in this litigation.  Plaintiffs' counsel reviewed

approximately one million documents, attended approximately twenty depositions, and consulted

with Plaintiffs' expert, Edward Heiden, Ph.D., regarding economic issues, including the

quantification of damages incurred by consumers and the impact of product sampling.  Prior to

reaching the May 16, 2007 Settlement Agreement, on March 23, 2007, Plaintiffs filed their Motion

for Class Certification, which included the declaration of Plaintiffs' expert economist, Edward J.

Heiden, Ph.D.

B.     __The Settlement__

The settlement was reached after Plaintiffs had conducted lengthy discovery and engaged in extensive briefing on the issues in this case.  The settlement was the product of arms-length (and often contentious) negotiations spanning several months, which included the assistance of Magistrate Judge Kay.  Pursuant to the Settlement Agreement, Warner Chilcott shall donate one or more branded combined hormonal contraceptives (*e.g.* Loestrin 24, Femcon Fe, etc.) sold by Warner Chilcott (the "Warner Chilcott Products") with a retail value of $3,000,000 throughout the United States within a three-year period to begin on the effective date of any Court-approved settlement.  Warner Chilcott shall pay all costs associated with the donation of the Warner Chilcott Products, which shall be distributed by Warner Chilcott.  Warner Chilcott shall in its discretion donate the Warner Chilcott Products to one or more of the following:  (1) primary care physicians not currently receiving samples of the Warner Chilcott Products who, according to IMS data, prescribe combined hormonal contraceptives; (2) university health centers or clinics; or (3) charitable organizations providing reproductive healthcare services to women.  Warner Chilcott shall certify its compliance with this provision to Class Counsel on the one-, two-, and three-year anniversaries of the effective date of the Court-approved settlement, setting forth the value of the Warner Chilcott Products donated in the preceding year.

Similarly, Barr shall donate one or more branded combined hormonal contraceptives (*e.g.*, Seasonique, Mircette, etc.) sold by Barr (the "Barr Products") with a retail value of $3,000,000 throughout the United States within a three-year period to begin on the effective date of any Court-approved settlement.  Barr shall pay all costs associated with the donation of the Barr Products, which shall be distributed by Barr.  Barr shall in its discretion donate the Barr Products to one or more of the following:  (1) primary care physicians not currently receiving

samples of the Barr Products who, according to IMS data, prescribe combined hormonal contraceptives; (2) university health centers or clinics; or (3) charitable organizations providing reproductive healthcare services to women.  Barr shall certify its compliance with this provision to Class Counsel on the one-, two-, and three-year anniversaries of the effective date of the Court-approved settlement, setting forth the value of the Barr Products donated in the preceding year.

Additionally, the Settlement Agreement requires that two separate escrow accounts shall be established and administered under the Court's continuing supervision and control pursuant to the following terms:

A.    <u>Fees and Expenses Account</u>.  Warner Chilcott and Barr shall jointly create an escrow account (the "Fees Account") and shall each contribute $1,000,000 to the account, for a total value of $2,000,000.  Subject to Court approval, from this Fees Account shall be paid reasonable fees and expenses incurred by Plaintiffs' counsel and any incentive awards to the named Plaintiffs in the above-referenced action.  Plaintiffs' counsel shall apply to the Court for distributions to be made from the Fees Account. Warner Chilcott and Barr shall not object to Plaintiffs' counsel's request for attorneys' fees and reimbursement of expenses up to $2,000,000 or to incentive awards up to $7,500 per named Plaintiff.

B.    <u>Notice and Administration Account</u>.  Warner Chilcott and Barr shall jointly create an escrow account (the "Notice Account") and shall each contribute $150,000 to the account, for a total value of $300,000.  Upon preliminary approval of the settlement by the Court, from this Notice Account shall be paid the costs to provide

notice as described below and of any notice administration expenses, including any

notice administrator fee.

## III. THE COURT SHOULD CONDITIONALLY CERTIFY THE PROPOSED SETTLEMENT CLASS AND APPOINT CLASS COUNSEL

This Motion for Preliminary Approval of the Settlement Agreement seeks conditional

certification of the following Settlement Class ("Settlement Class"):

> All persons who purchased Ovcon 35 for personal or household use in the United
> States at any time during the period from April 22, 2004 through the date of the
> Preliminary Approval Order.  Excluded from the Settlement Class are all
> governmental entities and the Defendants, their directors, officers and employees,
> and their respective subsidiaries and affiliates.

### A. This Action Satisfies the Requirements of Rule 23(a)

Rule 23(a) provides that in order to proceed as a class action:

> One or more members of a class may sue or be sued as representative parties on
> behalf of all only if (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the class, (3) the
> claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly and adequately
> protect the interests of the class.

Fed.R.Civ.P. 23(a).  Each of these criteria is satisfied here.

### 1. Numerosity is Clearly Present.

The first requirement in maintaining a class action under Rule 23(a) is that the proposed

class be so numerous that joinder of all members is impracticable.  Fed.R.Civ.P. 23(a)(1).

Plaintiffs need not prove the exact size of the proposed class, but rather must demonstrate only

that the number is sufficiently large so as to make joinder impracticable.  *In re Cardizem CD

Antitrust Litig.,* 200 F.R.D. 326, 335 (E.D. Mich. 2001).  "*A finding of numerosity* may be

supported by common sense assumptions, and it *is especially appropriate in antitrust actions

brought under Rule 23(b)(3)*."  *Id.*  (citing *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231,

239 (E.D.N.Y. 1998) (citing 4 *Newberg on Class Actions,* § 18.03, n. 17 (2d ed.1985))(emphasis

added).  In 2005 alone, Ovcon had U.S. sales in excess of $100,000,000, and it is estimated that approximately 2,000,000 consumers purchased Ovcon during the Class Period.  Thus, members of the Settlement Class are so numerous and geographically dispersed that joinder of all members is impracticable.  *See, e.g., In re Vitamins Antitrust Litig.,* 209 F.R.D. 251 (D.D.C. 2002).

### 2. Common Questions of Law or Fact Exist.

The second prerequisite is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2).  "The commonality test is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 26 (D.D.C. 2001).  Plaintiffs here raise common issues of law and fact, including ". . . whether Defendants combined, agreed, or conspired [] in restraint of trade. . ."  Am. Complt. ¶ 63.  Such issues have been found to satisfy the commonality requirement in other antitrust cases.  *See, e.g., Lorazepam,* 202 F.R.D. at 27 (citing *In re Ampicillin Antitrust Litig.,* 55 F.R.D. 269, 273 (D.D.C. 1972)).

### 3. The Claims of the Representative Plaintiffs are Typical of the Claims of the Settlement Class.

Rule 23(a)(3) requires that the representative plaintiffs' claims be "typical" of the claims of the class.  " '[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' "  *Cardizem*, 200 F.R.D. at 335 (quoting *In re Am. Med. Sys.,* 75 F.3d 1069, 1082 (6th Cir. 1996))(quoting 1 *Newberg on Class Actions,* § 3-13, at 3-76 (footnote omitted)).  "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members."  *Id.* (citing 1 *Newberg,*

*supra*, § 3-13, at 3-75). "***Courts considering this prerequisite have observed that 'claims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices.'***" *Id.* (quoting *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 241)(citing *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D.Minn.1995)) (emphasis added).

Here, as in other antitrust price-fixing cases, Plaintiffs' claims and the claims of the absent Class Members arise from the same events, involve the same legal theory, and the same elements of proof. Therefore, the interests of the Settlement Class representatives and the absent Class Members are sufficiently aligned. "Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification." *Cardizem*, 200 F.R.D. at 335 (quoting *In re Playmobil Antitrust Litig*., 35 F.Supp.2d at 242).

In this case, Plaintiffs' claims arise from the same conduct giving rise to the claims of the prospective Settlement Class, and the relief Plaintiffs seek is common to the Settlement Class. *See Cardizem,* 200 F.R.D. at 335; *In re Playmobil Antitrust Litig.,* 35 F. Supp. 2d 231, 241-42 (E.D.N.Y. 1998). Plaintiffs allege that as a result of Defendants' unlawful monopolization and attempted monopolization of the market for Ovcon through an illegal horizontal agreement, Plaintiffs and Class Members paid supra-competitive prices. *See* Am. Complt. ¶ 60, *et seq*. These allegations, which must be accepted as true for purposes of class certification, demonstrate that Plaintiffs' claims are typical of the claims of all Class Members in satisfaction of Rule 23(a)(3).

### 4. The Representative Plaintiffs Will Fairly and Adequately Protect the Interests of the Settlement Class.

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This prerequisite requires

that the Court examine such factors as the quality of class counsel, the existence of any adverse interests between class representatives and other class members, communication between class counsel and the class, and the overall context of the litigation. *See Kifalfi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 177 (D.D.C.1999) (citing *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C.Cir.1997)).

As demonstrated by the firm resume attached as Plaintiffs' Exhibit "B," counsel for the Plaintiffs have successfully litigated numerous class actions and other complex cases on behalf of consumers.  Clearly, Plaintiffs' counsel are experienced trial lawyers who will vigorously and adequately represent the Class.

Similarly, the representative Plaintiffs will fairly and adequately represent the Class. The representative Plaintiffs and each member of the proposed Settlement Class share the identical objectives of establishing liability and obtaining damages and restitution. No conflict of interest exists as to either of these goals as all Plaintiffs will desire to recover as damages that portion of the overpayment that is attributable to their payments.  Accordingly, the adequacy requirement of Rule 23(a)(4) is fully satisfied.

**B.   This Action Fulfills the Requirements of Rule 23(b)(3).**

The Court's task under Rule 23(b)(3) is to determine whether common questions of law or fact predominate over individual ones and whether the proposed class action is superior to other available methods of adjudication.

### 1.  Predominance

"The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market Makers Antitrust Litig.,* 169 F.R.D. 493, 517 (S.D.N.Y. 1996).  When determining

predominance:

> There are no bright lines for determining whether common questions predominance. Instead, considering the facts of the case presented, a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position. Common questions need only predominate: they need not be dispositive of the litigation.

*In re Potash Antitrust Litig.,* 159 F.R.D. at 693 (internal citations omitted). *The predominance requirement "is a test readily met in certain cases alleging* consumer or securities fraud or *violations of the antitrust laws."* *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997)(emphasis added). "[C]ommon questions of liability for monopolization and price-fixing have frequently been held to predominate for the preliminary stage of class certification." *Lorazepam*, 202 F.R.D. at 29. Here, generalized evidence of liability on the part of Defendants clearly exists on a class-wide basis. Regarding Plaintiffs' claims for violation of the antitrust and/or consumer protection laws of the indirect purchaser states, "[u]nder both federal and state law, the essential elements of a private antitrust action are the same. . . ." *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 275 (D.Mass. 2004). Similarly, common issues predominate for Plaintiffs' unjust enrichment claims since all jurisdictions apply the fundamental principle that a "person who is unjustly enriched at the expense of another is liable in restitution to the other." Restatement (Third) of Restitution & Unjust Enrichment, § 1 (1937). Indeed, courts are willing to certify nationwide classes even if minor differences in state law exist. *In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d 283, 315 (3d Cir. 1998) ("Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and trying them as a unit.")

## 2.  Class Treatment is Superior.

In addition to the predominance of common questions, Rule 23(b)(3) requires that the Court determine that the class action device is superior to other available methods for the fair and efficient adjudication of these controversies.  Considerations of judicial economy and access to justice underscore the superiority of the class action in this case.  Class Members' individual claims are small when measured against the prohibitive cost of prosecution of this type of complex litigation, and a class action stands as the only practical method by which Plaintiffs and members of the Settlement Class can litigate their claims against Defendants.  *See, e.g., In re Synthroid Marketing Litig.*, 188 F.R.D. 295, 302 (N.D. Ill. 1999).

## C.  **Proposed Class Counsel Meet the Requirements for Appointment Under Rule 23(g).**

Rule 23(g)(1) states, in pertinent part:

(1)  Appointing Class Counsel.
    (A)  Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.
    (B)  An attorney appointed to serve as class counsel must fairly and adequately represent the interests of the class.
    (C)  In appointing class counsel, the court
        (i)     must consider:
            •  the work counsel has done in identifying or investigating potential claims in the action,
            •  counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,
            •  counsel's knowledge of the applicable law, and
            •  the resources counsel will commit to representing the class;
        (ii)    may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

Plaintiffs seek the appointment of the Law Offices of Robert W. Sink as Class Counsel.  As demonstrated by the firm resume attached hereto as Exhibit "B," proposed Class Counsel has successfully litigated numerous class actions and other complex cases on behalf of consumers, and is knowledgeable about antitrust law and class action practice.  Proposed Class Counsel has

performed substantial work in identifying and investigating the Consumers' claims in this case,

participated in extensive discovery, and produced an expert declaration from economist Edward

J. Heiden, Ph.D.  Proposed Class Counsel has already committed and will continue to commit

substantial resources toward representing the Class.  Accordingly, it is respectfully requested that

proposed Class Counsel be appointed Class Counsel.

IV.     **THE PROPOSED SETTLEMENT IS WELL WITHIN THE RANGE OF POSSIBLE FINAL APPROVAL WARRANTING PRELIMINARY APPROVAL**

Rule 23(e)(1) of the Federal Rules of Civil Procedure provides:

A.     The court must approve any settlement, voluntary dismissal, or compromises of the claims, issues or defenses of a certified class.

B.     The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.

C.     The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.

Approval of class action settlements involves a two-step process.  First, the court

considers whether to approve the settlement preliminarily for purposes of communicating the

terms of the settlement to the proposed class.  Manual for Complex Litigation (Third) § 30.41 at

236-37 (1995).  Second, after notice and an opportunity for each class member to object to the

proposed settlement (or otherwise be heard) have been provided, the court will determine

whether the settlement is fair, reasonable, and adequate and whether the settlement should be

finally approved under Fed.R.Civ.P. 23(e).  *Id.* at 237-38.

Accordingly, in considering whether to grant preliminary approval, the Court is not

required to make a final determination on the adequacy of the settlement or to probe extensively

into the merits of the settlement. Both of these inquiries are reserved for the final approval stage of the class settlement approval process. Class members' substantive rights will not be prejudiced by preliminary approval, since the proposed preliminary approval is solely to obtain authority to notify the class of the terms of the settlement and to set the stage for the final approval of the settlement. *See Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir. 1980); *Berry v. School Dist.*, 184 F.R.D. 93, 97 (W.D. Mich. 1998); *Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 273 (N.D. Cal. 1976); 4 Newberg on Class Actions § 1.25 (4th Ed. 2002). "If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies . . . and [the settlement] appears to fall within the range of possible approval, the court should direct that notice" issue and should schedule a final approval hearing. Manual § 30.41.

At the preliminary approval stage, the Court considers whether there is any reason to doubt that the settlement is the result of bona fide arm's-length negotiations and whether it appears to fall within a range of reasonableness resolving all doubts in favor of preliminary approval. *See In re Vitamins Antitrust Litig.*, 2001 WL 856292 (D.D.C. 2001); *In re Vitamins Antitrust Litig.*, 1999 WL 1335318 (D.D.C. 1999).

Here, Plaintiffs will also address some of the elements of the more stringent framework typically employed by courts in this Circuit in determining whether to give final approval to settlements. In determining whether finally to approve a class action settlement, courts in this Circuit commonly examine the following factors: (a) whether the settlement is the result of arm's-length negotiations; (b) the reaction of the class members;[2] (c) the terms of the settlement in relation ot the strength of the plaintiffs' case; (d) the status of the litigation at the time of settlement; and (e) the opinion of experienced counsel. *See, e.g., In re Vitamins Antitrust Litig.*,

---

[2]    This requirement cannot be addressed pre-notice and is not a requirement for preliminary approval.

305 F. Supp. 2d 100, 104 (D.D.C. 2004)(Hogan, C.J.).

Even at this preliminary stage, consideration of these factors demonstrates that the settlement is entirely fair and reasonable for the Class.  Nevertheless, preliminary approval is a first step in beginning the settlement approval process with all doubts resolved in favor of preliminary approval.

A.     **The Proposed Settlement is the Product of Extensive Arm's-Length Negotiations by Informed, Experienced Counsel**

In approving class settlement, courts in this Circuit and others have repeatedly and expressly deferred to the judgment of experienced counsel achieving class-wide settlements through arm's-length negotiations.  Chief Judge Hogan observed that:  "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-790, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003)(quotation omitted); *see also Vitamins*, 305 F.Supp. 2d at 104; *In re Vitamins Antitrust Litig.*, No. 99-197, 200 U.S. Dist. LEXIS 8931, at *22 (D.D.C. Mar. 31, 2000); *Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996); *see also* Newberg on Class Actions § 11.51 ("[C]ourts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered.").  That presumption should attach here. Every aspect of the proceedings, from motion practice through the completion of the settlement negotiations, has been sharply contested.  The proposed settlement is the product of contentious negotiations, which took place over the span of several months.  The negotiations included several face to face meetings and numerous conference calls between counsel, as well as a conference call with Magistrate Judge Kay.  In fact, the negotiations were so hard fought that on

more than one occasion counsel from both sides were required to request that this Court extend the stay so that the parties would have more time to negotiate the terms of the Settlement Agreement.

**B.    The Proposed Settlement Terms Are Within the Range of Possible Approval and are Fair, Reasonable and Adequate in Relation to the Strength of Plaintiffs' Case**

This Consumer Action faced the following hurdles.

First, Plaintiffs faced the defense that the exclusive license and supply agreements between Warner Chilcott and Barr were entered into for legitimate business reasons, namely because Warner Chilcott was experiencing serious supply problems with its then supplier of Ovcon, Bristol Myers-Squibb ("BMS"). Defendants offered contemporaneous evidence of substantial and on-going problems with BMS's supply of Ovcon to Warner Chilcott. Defendants alleged that Warner Chilcott entered into the agreements to ensure a steady and reliable supply of Ovcon. Defendants also alleged, and provided expert testimony by Dr. Tracy Lewis, that an exclusive license agreement with Barr was the best way to ensure Barr fulfilled its contractual obligations. If these arguments were accepted, a jury could have found that no violation of the antitrust laws had occurred.

Second, Plaintiffs faced the defense that, due to the continuation of heavy, free sampling of Ovcon by Warner Chilcott, the agreements were not anti-competitive. Defendants alleged that consumers would have paid more for generic Ovcon than for the sampled branded Ovcon. To support this contention, Defendants provided the expert testimony and analyses by Drs. Sumanth Addanki, Gregory Bell, Henry Grabowski, John Hauser and Jerry Hausman. Specifically, Defendants alleged that if a generic version of Ovcon had entered the market, Warner Chilcott would have stopped distributing free samples to physicians. Defendants' experts opined that the

15

savings to consumers from free samples given before a generic entered the market resulted in a lower price for the branded product than consumers would have received when a generic entered the market and sampling ceased.  Defendants also alleged, and supported by expert testimony, that as a result of sampling Plaintiffs suffered minimal or no damages.  If Defendants' sampling argument was accepted, a jury could have found that no violation of the antitrust laws had occurred and that, even if a violation occurred, Plaintiffs' total damages, if any, would be nominal.

Third, Plaintiffs faced the defense that Ovcon competed with over 80 other brand-name and generic oral contraceptives.  Defendants produced contemporaneous documents and their employees testified in support of their defense that Warner Chilcott viewed other oral contraceptive manufacturers as competitors.  In addition, Defendants continue to contend that documents produced and testimony given by third-party oral contraceptive manufacturers in this action support their argument that oral contraceptives are interchangeable.    Defendants also provided the expert testimony of  Drs. Addanki, Bell and Hausman that consumer switching behavior demonstrates that Ovcon competes with dozens of other combined hormonal contraceptives, and that consumers could have purchased another lower-priced brand-name or generic alternative.  Again, if this argument were accepted, a jury could have found that no violation of the antitrust laws had occurred.

Indeed, even if Plaintiffs were to prevail at trial, costly and time-consuming appeals could follow whereas this settlement allows for a relatively prompt recovery.  *Pigford v. Glickman*, 185 F.R.D. 82, 104-05 (D.D.C. 1999).

The total value of the settlement is $8,300,000.  While appropriately discussed more fully on final approval briefing, Plaintiffs had calculated top-end single damages of approximately

$12,000,000.[3]  Given the risk factors discussed above, a significant discount to settle would be warranted.  Nonetheless, Plaintiffs have achieved a settlement value that exceeds 75 percent of single damages.  Other settlements involving a dramatically smaller percentage of single damages have been routinely approved.  *See, e.g. In re Childrens' Ibuprofen Oral Suspension*, Misc. No. 1:04-mc-0535 (ESH) (D.D.C. Dec. 11, 2006) (approximately 25 percent of total damages approved); *In re Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,  2005 U.S. Dist LEXIS 9705, * 30 (E.D.Pa., May 20, 2005) (11.4 percent of total damages approved and compared favorably to settlements in other complex class actions and citing cases); *In re Linerboard Antitrust Litig.*, 296 F. Supp.2d 568 (E.D.Pa. 2003) (36 percent of damages approved); *Erie Forge and Steel Inc. v. Cyprus Minerals Co.*, Civil No. 94-404, 1994 WL 485803 (W.D.Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million).

It is estimated that approximately 2,000,000 consumers purchased Ovcon during the Class Period.  Since the value of the settlement totaled $8,300,000, it became clear that the cost of administering individual claims and the cost to consumers to obtain required records and proof of claims would swallow any individual recoveries.  Accordingly, after vigorous and lengthy negotiations, it became clear that a resolution involving donated product to physicians, universities, and charitable organizations was the most viable way to benefit consumers.  "In a settlement context, when an aggregate class recovery cannot economically be distributed to class members . . . the parties, subject to court approval, may agree that . . . funds [or products] will be distributed or disposed of for the indirect benefit of the class . . . [T]hese distributions have obtained a stamp of approval as part of a class settlement."  Newberg on Class Actions, Fourth Ed., § 11:20 (citations omitted).  Such distributions have been approved in other cases with

---

[3]        Provided that all of the indirect states were certified as a Class.

similar circumstances where the cost of administration would consume any distributions. *See In re Childrens' Ibuprofen Oral Suspension*, Misc. No. 1:04-mc-0535 (ESH) (D.D.C. Dec. 11, 2006) ($3 million product donation settlement approved); *Conroy v. 3M Corporation*, No. C-00-2810 CW (N.D.Ca. Apr. 21, 2006) (approving settlement where 3M donated tape and other product valued at $41,000,000 to charities throughout the United States).

It has been held that "[t]he decision to forego individual recoveries was sensible, given the difficulty of identifying proper claimants and the difficulty, and especially the costs, that such recoveries and their administration would have entailed. The net monetary relief for any individual claimant would have been limited." *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 353 (E.D.N.Y. 2000). In *Reebok Int'l, Ltd.,* 96 F.3d. 44 (2d Cir. 1996), the Second Circuit upheld a such a settlement where distributions "would be consumed in the costs of . . . administration." *Id.* at 49; See also *Keds Corp.*, 1994 WL 97201, at *3 (approving charitable distribution of settlement proceeds in lieu of direct refunds to individual consumers where the damages per customer were small, it would be difficult if not impossible to trace the purchasers, and the costs of administration would "wipe out any economic benefit of the settlements").

Here, it is neither practical nor economical to provide benefits directly to individual Class Members for several reasons. First, while the Settlement Class is very large, the alleged overcharge that would have resulted from each consumer purchase is small. Second, Defendants offered expert testimony that most women stay on an oral contraceptive for relatively short periods, which, if accepted, would further limit the amount of any potential recovery by consumers. Third, Class Members are spread out over a wide geographic area. Fourth, Defendants contended that any alleged overcharge would have to be decreased by the amount of any free Ovcon samples a particular consumer received, which would require an expensive and

time consuming inquiry into the purchasing and sampling history of every consumer. Finally, most Class Members will not have kept records that confirm their Ovcon-35 purchases or samples received, making it even more costly to identify the proper claimants and determine what amount to distribute to them. Simply stated, individual cash payments to the Class Members would not be economically feasible given the complexity and uncertainties inherent in complex antitrust cases in general and the unique challenges posed by this case in particular. Thus, the proposed settlement falls "within the range of fair, adequate and reasonable settlements deserving of [approval]." *Vitamins*, 305 F.Supp. 2d at 105.

### C.  An Appropriate Point for Settlement Has Been Reached

In evaluating a proposed settlement, courts consider "the stage of the proceedings when settlement has been offered and [the] degree of completed discovery." *In re Nat'l Student Mktg. Litig.,* 68 F.R.D. 151, 155 (D.D.C. 1974). "Courts thus consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and the range of recovery." *Lorazepam & Chlorazepate*, 205 F.R.D. at 377.

The proposed settlement is the product of an extensive analysis of the factual and legal issues involved in this case. Prior to beginning settlement negotiations, Plaintiffs' Counsel had reviewed approximately one million documents and participated in approximately twenty depositions. Additionally, Plaintiffs' Counsel engaged in extensive briefing on the issues in this case, including responding to Defendants' Joint Motion to Dismiss Plaintiff's Amended Complaint and preparing Plaintiffs' Motion for Class Certification. Moreover, Plaintiffs' Counsel obtained and produced an expert report from an economist, and reviewed nine lengthy expert reports in the related Government actions. There is no question that, at the time

settlement was reached, both parties possessed very well-considered views of the merits of their

respective positions and the potential for, and likely amount, of any recovery.  *See Osher v. SCA*

*Realty, Inc.*, 945 F. Supp. 298, 305 (D.D.C. 1996) (finding it significant that counsel had "an

adequate appreciation of the merits of the case").

Settlements that do not come too early to be suspicious or too late to be a waste of

resources, but which come at a desirable point in litigation for the parties to reach an agreement

and to resolve issues without further delay, expense, and litigation are favored.  *Vitamins*, 305 F.

Supp. 2d at 105.

### D.    The Opinion of Experienced Counsel Supports Approval

The "[o]pinion of experienced and informed counsel should be afforded substantial

consideration" by a court in evaluating the reasonableness of a proposed settlement.  *Lorazepam*

*& Clorazepate,* 205 F.R.D. at 380.  Proposed Class Counsel firmly believes that the proposed

settlement is fair, reasonable, and adequate to the Class.  Counsel is very experienced in class

action and antitrust matters.  Indeed, Plaintiffs have achieved a settlement value that exceeds 75

percent of single damages.

Consequently, the opinion of proposed Class Counsel that the proposed settlement is

"fair, adequate, and reasonable" is deserving of this Court's consideration.  *Vitamins*, 305 F.

Supp. 2d at 106; *see also Lorazepam & Clorazepate*, 205 F.R.D. at 380.

## V.    NOTICE TO THE SETTLEMENT CLASS IS APPROPRIATE

Rule 23(e)(1)(B) states:  "The court must direct notice in a reasonable manner to all class

members who would be bound by a proposed settlement, voluntary dismissal, or compromise."

For any class certified under Rule 23(b)(3), the court must direct to class members the best

notice practicable under the circumstances.  Fed.R.Civ.P. 23(c)(B).  The purpose of the notice is

to "afford members of the class due process which, in the context of a Rule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment." *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992)(citation omitted). The proposed notice program clearly meets this standard.

Here, publication notice using the weekend edition of *USA Today*, an extensive internet campaign, and other media including TV and radio stations, costing approximately $300,000, will be utilized. Publication notice has long been held to satisfy the requirements of due process as notice designed to reach those interested in objecting and likely safeguards the interests of all. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 319 (1950). Individual notice is simply not practicable in this case. Class Members did not directly purchase Ovcon 35 from Defendants, and their identities cannot be readily ascertained. Moreover, patient privacy concerns militate against individual notice due to the potential for disclosing that a woman has used birth control pills to other members of her household. *See, e.g., In re Lupron Marketing and Sales Practices Litigation,* 228 F.R.D. 75, 96 (D. Mass. 2005) (finding that notice to consumer class members comported with due process requirements and noting that "direct mail was not used to contact the consumer class because of privacy and practicality concerns" which, according to the notice expert, were paramount because such mailings would involve "very personal issues, prostate, infertility, [and] precocious puberty."). Publication notice has been approved in similar pharmaceutical antitrust cases, such as *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3rd Cir. 2004), where the Third Circuit upheld the District Court's ruling that publishing a summary notice in publications likely to be read by consumer claimants along with a call-center and a website with information and downloadable forms was "the best notice practicable under the circumstances." *Id.* at 536-37. See also *In re Childrens' Ibuprofen Oral*

*Suspension*, Misc. No. 1:04-mc-0535 (ESH) (D.D.C. Dec. 11, 2006); *In re Lupron Marketing and Sales Practices Litig.,* 228 F.R.D. 75 (D. Mass. 2005).

  To administer the notice program, Class Counsel has retained BrownGreer, PLC as Notice Administrator.  Orran Brown, Esquire, a principal at BrownGreer, has substantial experience in designing and implementing notice programs in class action cases.  *See* Affidavit of Orran Brown ¶ 8 (Exhibit "C").  By using newspaper and internet notification, the proposed notice should reach approximately 51.7 million individuals, the majority of whom are members of the target audience.  *Id.* at ¶ 12(a).  United States Census data reveals that there are approximately 60 million women between the ages of 15 and 44 (*i.e.*, the target audience) currently residing in the United States.  *Id.*  Mr. Brown has concluded, based upon his experience as an administrator of notice campaigns and claims facilities, and as a teacher of class action law, that the notice program to be used in this action is sufficient to provide extensive and clear information to the targeted population regarding this settlement, and is the best notice practicable under the circumstances.  *Id.*

  As stated in the Settlement Agreement, the Settlement Class consists of "[a]ll persons who purchased Ovcon 35 for personal or household use in the United States at any time during the period from April 22, 2004 through the date of the Preliminary Approval Order."  Since Ovcon 35 is an oral contraceptive, it is fundamental that the Settlement Class primarily consists of women of reproductive age, *i.e.*, women between 15 and 44 years old.  Affidavit of Orran Brown at ¶ 10(a).  Moreover, "[m]ore than 50 percent of women between the ages of 15 and 24 reported using the pill . . . .  Pill . . . use decreased and female sterilization increased steadily with age.  Among women between the ages of 40 and 44, only 11.0 percent reported using the pill . . . ."  *Id.*

The notice program has been designed to reach the target audience (*i.e.*, women between the ages of 15 and 44) using newspaper publication, an extensive internet campaign, and other media including TV and radio stations. Internet penetration has now reached 73% for all American adults. Affidavit of Orran Brown at ¶ 10(b). With respect to the target audience here, 88% of 18-29 year-olds go online, and 84% of 30-49 year-olds go online. *Id.* In sharp contrast, daily newspaper readership for 18-24 year-olds is 37%, for 25-34 year-olds is 35%, and for 35-44 year-olds is 47%. *Id.* Indeed, *The New York Times - through nytimes.com* - recently reported that "[t]he circulation of the nation's daily newspapers plunged during the latest reporting period in one of the sharpest declines in recent history. . ." and that "[t]he losses have accelerated as the industry tries to adjust to the steady migration of readers and advertisers to the Internet." *Id.* citing www.nytimes.com, *Newspaper Circulation Falls Sharply*, Katharine Q. Seelye, October 31, 2006. Accordingly, a largely internet-based campaign is best suited to reach the target audience in this case and is far superior to printed media in achieving that goal. *Id.*

The short form notice will run in the weekend edition of *USA Today*. The weekend edition of the *USA Today* has a circulation of 2.5 million with approximately 5.2 million readers nationwide. It is printed and distributed on Friday, Saturday, and Sunday. The short form notice will be a one-quarter page ad, which will be in substantially the same form as Exhibit "D."

Since internet reach for the target audience is nearly double that of newspapers, the notice plan also includes an extensive internet strategy to increase the likelihood that members of the Settlement Class will be notified of the settlement. Banner ads will be placed on websites that are most likely to reach potential Class Members. Each internet banner ad will be approximately 6 inches by ¾ of an inch and contain the following text:

*ATTENTION OVCON CONTRACEPTIVE USERS*: A class action settlement may affect

your legal rights. Click here for more information:  www.ovcon35settlement.com

Internet notice will run for a period of four weeks and will include placements with the following online media:

(1)    **Gorilla Nation Women's Channel:**  An advertisement for the notice and settlement website will run as a banner ad on the Gorilla Nation Women's Channel website.  Gorilla Nation is the largest online advertising sales representation company, handling media sales for over 400 websites and select vertical networks. This women's channel consists of 43 websites with overwhelmingly female user demographics targeting women from young adults to mature audiences.  The 43 websites combine to receive 47.9 million unique visits per month.  The banner ad will load a total of 34.1 million times over a period of 28 days.

(2)    **iVillage:**  iVillage.com, a wholly-owned subsidiary of NBC Universal, is marketed as "the Internet for women" and consists of several online and offline media-based properties that seek to enrich the lives of women, teenage girls and parents through the offering of unique content, community applications, tools and interactive features, including online magazine publications of Redbook, Cosmopolitan, and Good Housekeeping.  iVillage.com offers advertisers access to one in seven of all women online age 18 or older, and access to one in seven of all women online between the ages of 25 and 54.  The site receives 15 million unique visitors each month.  The banner ad will load a total of 5 million times and will run for 28 days.

(3)    **Internet Service Provider Banner Ads:**  Ads will be displayed on the news homepages of America Online, MSN, Comcast and other Internet Service

Providers.  This placement will allow wide dissemination of the ad to viewers who

may not visit any of the heavily trafficked women's websites on a regular basis.  The

ad will load a total of 3.3 million times and run for 28 days.

      **(4)**    **Google Adwords and Yahoo Keywords:**  Google and Yahoo are the

two largest search engines, with 5 billion searches run each month, accounting for

75% of the share on Internet searching.  Placing sponsored links on each of these sites

will guarantee the link appears on the first page when any user enters a search term

that the parties provide as being relevant to the target demographic.  These allow the

most targeted placement of the ads to people investigating information that is linked

to the settlement.

Both the printed notice and Internet banner ads will include the address for the official

settlement website which potential Class Members may access to learn about the settlement.  The

official settlement website may be found at www.ovcon35settlement.com and will be maintained

by the Notice Administrator.  The settlement website will contain links to the long and short

form notices, as well as the Settlement Agreement.  The long form notice will be in substantially

the same form as Exhibit "E."

In addition, a toll-free telephone number will be established for inquiries and a post office

box will be established to receive any objections or opt-out requests which may be sent.  The

printed notice shall include the toll-free number so that potential Class Members may gather

information about the settlement.

Finally, a press release will be issued through PR Newswire Service (US1), which will

reach over 4,000 daily newspapers, journals, news bureaus, and TV and radio stations located in

all 50 states and the District of Columbia.  In addition, PR Newswire US1 distributes notices to

3,600 computer on-line databases, where the notices are automatically displayed on websites. See *Thomas v. NCO Financial Systems, Inc.*, 2004 WL 727071 (E.D.Pa. 2004) (approving notice utilizing PR Newswire Service and *USA Today* only).

The form and manner of notice satisfy the requirements of Rule 23(e). The proposed notice provides a description of the Settlement Class and the procedural status of the litigation, and advises Class Members of their rights under Rule 23(b)(3), including the right to be heard as to the reasonableness and fairness of the settlement, the right to be excluded from the proposed Class, and the method by which exclusion can be accomplished. The notice also sets forth the significant terms of the Settlement Agreement, including a description of the Product Donation being made by Warner Chilcott and Barr. The notice program also describes the uppermost limit which will be requested for attorneys' fees, costs and any incentive awards which may be requested. The intent is to fully inform Class Members of everything to be decided at the final Fairness Hearing. A full explanation of this issue will be made when the formal application for fees is made. Thus, the notice fairly describes the proposed Settlement Agreement and its legal significance as well as that of the class action, thereby satisfying the notice requirements of Rule 23(e).

Accordingly, the proposed form and manner of notice will satisfy both Rule 23(e) and due process requirements.

## VI.    PROPOSED TIMETABLE

The following schedule is proposed for completing the settlement approval process:

    **1.**    No later than 45 calendar days after entry of an order granting conditional

        certification of the Proposed Class and preliminary approval of the proposed

settlement, the short form notice shall be published in the weekend edition of *USA Today*, the long form notice shall be posted on the Ovcon 35 website, and the internet notice campaign shall be initiated;

2.  No later than 45 calendar days after the first date of internet notice shall be the postmark deadline for opting out of the Settlement Class and the filing and postmark deadline for objecting to the settlement;

3.  No later than 15 calendar days from the opt-out date, Plaintiffs shall file their motion for final approval of the settlement and their motion for fees, expenses and incentive awards;

4.  The final Fairness Hearing shall be held by the Court no sooner than 30 calendar days from the opt-out deadline.

## VII.  CONCLUSION

Plaintiffs, on behalf of themselves and all others similarly situated, request that this Court conditionally certify the Settlement Class, appoint the requested Class Counsel, preliminarily approve the Proposed Settlement Agreement, approve the Proposed Form and Manner of Notice and approve the Proposed Timetable or a schedule satisfactory to the Court.

Respectfully submitted,

_____

Robert W. Sink, Esquire, Bar No. PA0022
**LAW OFFICES OF ROBERT W. SINK**
319 West Front Street
Media, PA 19063
Tel:    610-566-0800
Fax:    610-566-4408

Dated:  June 5, 2007              *Attorneys for Plaintiffs*

27