IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

STEPHANIE COHEN and SUNDA
CROONQUIST, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

WARNER CHILCOTT PUBLIC
LIMITED COMPANY, WARNER
CHILCOTT HOLDINGS COIMPANY
III, LTD., WARNER CHILCOTT
CORPORATION, WARNER
CHILCOTT (US) INC., WARNER
CHILCOTT COMPANY, INC., GALEN
(CHEMICALS), LTD., and BARR
PHARMACEUTICALS, INC.,

Defendants.
_____

Civil Action No: 1:06CV00401 (CKK)

Jury Trial Demanded

### DECLARATION OF ORRAN L. BROWN

1.  *Personal Information.* My name is Orran L. Brown. I am the Chairman and a founding partner of BrownGreer PLC, located at 115 S. 15th Street, Suite 400, Richmond, Virginia.

2.  *Personal Knowledge.* The matters set forth in this Declaration are based upon my personal knowledge, based upon my experience and training, and based upon information received by my firm as the Notice Administrator for the Ovcon 35 Consumer Settlement.

3.  *General Description of Firm.* BrownGreer PLC is a firm that specializes in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the

1

resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicle.

4. *Education.* I received a Bachelor of Arts degree in Government and Foreign Affairs *summa cum laude* from Hampden-Sydney College in Hampden Sydney, Virginia, in 1978. I received my J. D. degree from Harvard Law School in Cambridge, Massachusetts, *cum laude*, in 1981.

5. *Professional Experience.* From 1981-82 I served as the law clerk to the Hon. Robert R. Merhige, Jr., United States District Judge for the Eastern District of Virginia, in Richmond, Virginia. From there, I practiced in Houston, Texas, from 1982 until February 1986, first with Liddell, Sapp, Zively, Brown & LaBoon, and then with Miller, Keeton, Bristow & Brown, where I handled general litigation matters, including working on the *Pennzoil v. Texaco* suit arising from Texaco's acquisition of Getty Oil. From February 1986 until January 1995, I was first an associate and then a partner at Christian & Barton, a law firm in Richmond, Virginia. There, I handled securities for all class actions, employment, products liability, and other commercial litigation in state and federal courts in Virginia and elsewhere, and served as an arbitrator for the America Arbitration Association for securities fraud and construction cases. From January 1995 through June 1999, I was the primary outside general counsel to the Dalkon Shield Claimants Trust in Richmond, Virginia, which is described in more detail below. From June 1999 through September 16, 2002, I was the Director of the Mass Claims Resolution Group in the Richmond, Virginia office of the Minneapolis law firm of Bowman and Brooke, where I specialized in legal and administrative aspects of mass claims resolution. On September 16, 2002, my partner, Lynn Greer, and I founded the firm BrownGreer PLC, in Richmond, Virginia, and we have operated it continuously since then.

6. *Teaching Experience.* From 2001 through 2004, I taught an upper-level course at the University of Richmond School of Law in Complex Litigation, including the notice and other legal aspects of class actions under Fed.R.Civ.P. 23 and state law equivalents. Before that time,

2

beginning in the fall semester of 1997, each semester I taught a trial practice and appellate practice course at the University of Richmond School of Law to second-year students.

      7.    ***Primary Projects in the Mass Claim Area.***  I have practiced in this field since 1989. I provide here a summary of my primary engagements in this area:

    (a)    **Dalkon Shield Claims:**  Beginning in December 1989, I was outside counsel to the three trust funds created in the Chapter 11 proceeding of the A. H. Robins Company to handle over 500,000 personal injury claims arising from the Dalkon Shield IUD, the Dalkon Shield Claimants Trust, the Dalkon Shield Other Claimants Trust, and the Breland Insurance Trust. I served in that role until we secured court approval to close the last of the three trust facilities on April 30, 2000. In that role, I advised the Trust's management, trustees, inside counsel, and other outside counsel in the United States and other countries on the legal and managerial aspects of the Trust's fiduciary duties, operations (including employment issues and the Trust's lease, banking, investment and other contractual relationships), claims processing arrangements, notices of deadlines, communication to claimants regarding processing and filing deadlines and coordination and design of Alternative Dispute Resolution, arbitration, and trial proceedings on Dalkon Shield Claims. I handled the judicial proceedings arising out of implementing the bankruptcy Plan, leading to over 170 decisions by the United States District Court and the United States Bankruptcy Court for the Eastern District of Virginia and over sixty-five rulings from the Court of Appeals for the Fourth Circuit affecting various legal and operational aspects of the three trust funds.

    (b)    **Diet Drug Litigation:**  Since December 1999, I have represented Wyeth (formerly known as American Home Products Corporation) as its Liaison Counsel to the AHP Settlement Trust created pursuant to the Nationwide Class Action Settlement Agreement resolving the claims of a nationwide class of persons who used Wyeth's prescription diet medications, Pondimin® and Redux™. The Settlement Agreement, dated November 18, 1999, was approved by the United States District Court for the Eastern District of Pennsylvania in Pretrial Order No. 1415, on August 28, 2000, in the proceedings known as *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203 (E.D.Pa.). The Settlement Agreement created a $1 billion fund to provide medical monitoring, research, drug refunds, and other benefits to persons who ingested the diet drugs, and a $2.55 billion fund to pay compensation to persons with certain medical conditions associated with use of the diet drugs. As Liaison Counsel, I and my firm handle countless legal and administrative issues arising in the implementation of the Settlement Agreement, including notices to the class and hearings before the supervisory court on such matters.

    (c)    **Sulzer Settlement:**  Since March 2002, our firm has provided full service legal representation and claims administration to the court-appointed Claims

3

        Administrator to implement the $1 billion nationwide Class Action Settlement Agreement approved by the United States District Court for the Northern District of Ohio to resolve the claims of 27,000 class members against the parent and subsidiary companies of U.S. and Swiss defendants Sulzer, Sulzer Medica, Sulzer AG, and Sulzer Orthopedics US.  The disputed claims include allegations of defective hip and knee prostheses manufactured over several years.  We have assisted in designing claims forms, drafting the court-approved notice to class members, and designing the claims administration processes for reviewing claims and scheduling payment.  We receive and maintain an inventory of claim submissions.  We designed and maintain the database to track and assist with the processing of those claims.  We also staff a call center with carefully trained operators who respond to thousands of class member and attorney inquiries a month.

    **(d)**    **Special Rates Litigation:**  From 2003 until 2006, I served as the sole Trustee of the administration of a class action settlement of certain federal employee wage claims in the United States Court of Federal Claims, *National Treasury Employees Union, et al. v. United States of America*, No. 02-128C (Special Rates Litigation).  As Trustee of the $180,000,000 Special Rates Settlement Trust, I monitored the implementation of the Settlement by the claims administration firm handling the claims, the investment banking institution responsible for the Trust's funds, and the adjudication of disputed claims by a national dispute resolution firm engaged for that purpose.  I also participated in the drafting and design of notices to the class on claims processing deadlines and other matters affecting the implementation of the Settlement.

    **8.**    *Examples of Experience with Notice Programs.*  My work as a lawyer and claims administrator regularly involves drafting the text of notices to known and unknown claimants or members of a class, designing the appearance of such notices to make them clear and understandable, and designing and implementing the method of distributing such notices in the best practicable manner to the persons or entities affected by them.  On countless occasions, I have also drafted and overseen the implementation of specific campaigns to certain groups of claimants before an existing claims facility, to accelerate the disposition of stall claims, alert claimants to information and materials needed to complete their claims to be reviewed for eligibility terminations, and to advise claimants of the results of processing steps on their claims.  In these matters, I have advised and participated in the implementation of notice programs to known and unknown potential claimants or class members, assessed the reasonableness and sufficiency of such notice programs, from both practical and legal perspectives, and worked with

4

consultants to place public notice in written and broadcast media. As a regular part of my practice, I advise companies and claims administrators and draft individual group notices to conform to applicable legal requirements and to make the text and instructions provided in such notices comprehensible and as simple as possible. In particular, I have worked on these major notice campaigns:

- (a) **Notice of Final Dalkon Shield Claim Filing Deadline:** I drafted the notices and designed the entire notice campaign issued by the Dalkon Shield Claimants Trust to provide public notice of the final deadline for the submission of any claim relating to the Dalkon Shield device to the claims facility. This campaign included a publication in mid-April 1994, in sixty-eight newspapers in the United States and internationally, of a quarter-page notice explaining the final claims deadline and the steps necessary to submit a claim before the deadline. The supervisory court found this notice to be sufficient to advise potential claimants, whose identities could not be determined through due diligence, of the deadline and the opportunity to receive compensation through the claims resolution process. *See In re A.H. Robins Co. (Smith v. Dalkon Shield Claimants Trust)*, 197 B.R 495 (E.D. Va.1995); *In re A.H. Robins Co. (Allen v. Dalkon Shield Claimants Trust)*, 197 B.R 501 (E.D. Va. 1995); *In re A.H. Robins Co. (Warren v. Dalkon Shield Claimants Trust)*, 197 B.R 503 (E.D. Va. 1995); *In re A.H. Robins Co. (Rothbard v. Dalkon Shield Claimants Trust)*, 197 B.R 509 (E.D. Va. 1996); *In re A.H. Robins Co. (Bennett v. Dalkon Shield Claimants Trust)*, 204 B.R 194 (E.D. Va. 1996).

- (b) **Dalkon Shield Claims Materials Deadline:** I drafted the text of and designed the mailing to provide actual notice to known Dalkon Shield claimants who had failed to complete their claims by the August 1, 1994 materials deadline to submit materials for consideration. We mailed this notice to approximately 7,000 such claimants. The supervisory court endorsed the legal sufficiency and the adequacy of this actual notice in *In re A.H. Robins Co. (Hamilton v. Dalkon Shield Claimants Trust)*, 197 B.R 505 (E.D. Va. 1995).

- (c) **Initial Notice of Diet Drug Settlement:** As counsel to Wyeth, I participated in the implementation of the notice campaign to provide notice of the preliminary approval of the national class action settlement of the diet drug litigation. This campaign included a television commercial broadcast 106 times over a period of five weeks on network television and 781 times, for six consecutive weeks, on various cable networks. It also included a summary notice of that appeared repeatedly in several magazines between January and March 2000, and as a one-third page black and white advertisement in four national newspapers, 77 local newspapers, three newspapers distributed throughout the United States territories and four newspapers targeted to the Hispanic market. This summary notice was also published in a variety of publications targeted to health care providers and pharmacists. The notice was mailed to all pharmacists in the United States,

      physicians who were likely to have prescribed the diet drug to patients, and to a mailing list of known diet drug users.  The actual notice was an extensive packet of materials that included an Official Court Notice, a simpler Guide to Class Members, and claim forms.  The mailing vendor selected by the parties for this notice mailed over 1,175,750 notices to known class members.  This notice campaign was approved by the supervisory court as sufficient in *Brown v. American Home Products Corporation,* (*In re Diet Drugs Products Liability Litigation)*, MDL No.1203, 2000 WL 1222042 (E.D. Pa. 2000).

**(d)** **<u>Notice of Final Judicial Approval of the Diet Drug Settlement</u>:**  I required by the Settlement Agreement in the diet drug litigation, I, along with Class Counsel and other parties, drafted the Official Court Notice mailed in February 2002 to over 830,500 persons on the official notice list, of the final judicial approval of the settlement, the claims filing and medical diagnosis deadline dates affected by the date of final approval, the terms of the Settlement Agreement and benefits available, the steps required to seek benefits or opt out of the settlement, and the consequences of failing to act by the deadlines.

**(e)** **<u>Notice of Claims Deadline in the Diet Drug Settlement</u>:**  In December 2002 through January 2003, as counsel to Wyeth, I, Class Counsel, and other counsel drafted the Official Court Notice of the May 3, 2003 diagnosis and claims filing deadline established by the diet drug Settlement Agreement.  This notice again described the terms of the settlement and benefits available, and the actions required to register for benefits before the final May 3, 2003 deadline.  The Trust mailed these notices January – February 2003 to over 743,200 class members on the official Notice List.

**(f)** **<u>Notice Administrator of Nextel Communications Settlement:</u>**  In January of 2004 I served as an expert witness in the class action field and advisor to the court on the adequacy of notification procedures in a large consumer class action involving improper monthly billing by Nextel Communications.  The notice campaign reached nearly five million class members.

**(g)** **<u>Notice of Seventh Amendment to the Diet Drug Settlement:</u>**  In June 2004 through September 2004, as counsel to Wyeth, I, Class Counsel, and other counsel drafted the Official Court Notice of the Seventh Amendment to the Settlement Agreement.  This notice described the terms of the Seventh Amendment, explained what benefits were available to class members under the agreement and provided direction to class members intending to object to or opt out of the new agreement.  BrownGreer mailed these notices from September – November 2004 to over 525,000 class members in the Trust database.

**(h)** **<u>Notice Administrator of Children's Ibuprofen Oral Suspension ("CIOS) Settlement:</u>**  In 2006 I served as Notice Administrator in a class action settlement that resulted in charitable donations to resolve claims of antitrust activities by two drug producers in the sale of Children's Ibuprofen.  I oversaw the dissemination of the notice in multiple national publications and designed and implemented an

internet notification campaign while also creating and maintaining a website for class member communications. The notice campaign reached nearly 10,000 potential class members via internet and newspaper publication.

9. *Materials reviewed in connection with this Declaration.* I reviewed the following materials to report on the administration of the Notice Program and the distribution of the Notice Fund:

    (a)    Settlement Agreement Between Class Plaintiffs and Defendants;

    (b)    Market studies analyzing the effectiveness of print media and newspaper circulation;

    (c)    Market studies assessing the effectiveness of internet advertising;

    (d)    Statistical information regarding the target audience and number of monthly users for various online media;

    (e)    Price information for the placement of advertisements in print and online media.

    (f)    Amended Class Action Complaint; and

    (g)    Long and Short Form Notices.

10. *Criteria for Assessment of a Notice Program*. The purpose of a notice program in a settlement such as this one is to provide the best notice that is practicable under the circumstances to potential class members of the existence of the settlement, its essential terms, the actions required to participate in this settlement, be excluded from it, or object to its terms, and the time periods in which to act, thereby providing them sufficient information to make an intelligent decision among available courses of action. The sufficiency of such a notice can be measured by how well it serves those objectives, using these criteria:

    **(a) Content of the Notice:** This criterion assesses whether the text of the notice clearly and accurately describes the essential terms of the settlement, the actions required to

seek benefits, be excluded from the settlement, or object to it, the deadlines by which such actions must be taken, and the consequences of acting or failing to act within those deadlines.

   **(b)  Method of Notice Distribution:**  This criterion assesses whether the notice program was reasonably calculated to provide notice by publication to potential class members.

   **(c)  Timing of the Notice:**  This criterion assess whether the notice was transmitted on dates that allowed potential class members sufficient time to receive the notice, realize a need to react to it, and take the actions necessary to participate in the settlement, be excluded from it, or object to it.

  The assessment and significance of these criteria vary depending upon the nature of the claims involved in the settlement, the sophistication of potential class members, the information available on known class members, and the complexity of the actions required to seek benefits under the settlement.  I have assessed the notice program provided by the parties in this settlement according to these criteria.

  **11.** *Content of the Notice*.  The notices to be used in this action will clearly and completely inform class members of the essential terms of the settlement, the actions required to seek benefits, to be excluded from the settlement, or object to it, the deadlines by which such actions must be taken, and the consequences of acting or failing to act within those deadlines.  The notices themselves adequately address the benefits available under the Settlement Agreement, the steps needed to object to the settlement, or to be excluded from it, the dates by which such actions are required, the time and place of the hearing on the fairness of the settlement, and the effect of the settlement on the legal rights of class members.  These aspects of the notice make it effective in conveying in understandable terms the information

needed by class members to make informed and timely decisions about the settlement. In particular, I comment on the following aspects of the long form notice:

(a) **General Information in the Notice:** Sections 1 through 4 of the notice provide understandable background information on the purpose of the notice, the nature of a class action, and the litigation giving rise to this settlement.

(b) **Class Membership:** Sections 5 and 6 of the notice describe who is and is not in the class in understandable terms. The class definition in this action in not unreasonably complicated and the notice clearly explains the criteria for membership.

(c) **Benefits:** Sections 7 and 8 of the notice describe in understandable terms the benefits being distributed by the settlement, and the definition of and reasons for a *cy pres* settlement such as this one.

(d) **Claims Released:** Section 9 of the notice clearly explains the implications if a class member does nothing in response to the notice and stays in the class.

(e) **Class Counsel:** Sections 10, 11 and 12 of the notice identify the class counsel and clearly describe their role.

(f) **Alternative Courses of Action:** Sections 13, 14, 15, 16, 17 and 18 of the notice fully describe the alternatives available to class members of receiving benefits, requesting exclusion, or objecting to the settlement. The steps for taking each action and the deadlines for doing so are clearly explained.

(g) **Fairness Hearing:** Sections 19, 20, and 21 of the notice advise of the time, place, and date of the hearing before the Court to consider the fairness of the settlement, including the class counsel's application for attorneys' fees. This description of this procedural process is clear and understandable.

**(h)  Additional Information:**  Section 22 of the notice clearly describes the sources where class members can obtain additional information regarding the settlement and the method for obtaining copies of the pleadings in the action.

12.    *Distribution of the Notice to the Settlement Class.*  In evaluating the distribution of the notice, I considered whether the notice program was calculated to provide notice to potential class members.  In particular, I considered the common characteristics of the settlement class.

**(a)  Target Audience: Women of Reproductive Age (15-44 Years)***:*  As stated in the Settlement Agreement, the settlement class consists of "[a]ll persons who purchased Ovcon 35 for personal or household use in the United States at any time during the period from April 22, 2004 through the date of the Preliminary approval Order."  Because Ovcon 35 is an oral contraceptive, it is fundamental that the settlement class primarily consists of women of reproductive age, *i.e.*, women between 15 and 44 years old.  See U.S. Department of Health and Human Services, Health Resources and Services Administration. *Women's Health USA 2005*. Rockville, Maryland: U.S. Department of Health and Human Services, 2005.  ("The majority of women of reproductive age (15-44 years) in the U.S. use contraception.".  Moreover, "[m]ore than 50 percent of women between the ages of 15 and 24 reported using the pill…Pill…use decreased and female sterilization increased steadily with age.  Among women between the ages of 40 and 44, only 11.0 percent reported using the pill…" *Id.*

**(b)  Internet Reach for the Target Audience is Nearly Double that of Newspapers***:*  Internet penetration has now reached 73% for all American adults. *See* Pew Internet & American Life Project, Data Memo Re: Internet penetration and impact April 2006, Mary Madden, http://www.pewinternet.org/.  With respect to the target audience here, 88% of 18-29 year-olds go online, and 84% of 30-49 year-olds go online.  *Id*.  In sharp contrast, daily newspaper readership for 18-24 year-olds is 37%, for 25-34 year-olds is 35%, and for 35-44 year-olds is 47%.  Indeed, *The New York Times* – through *www.nytimes.com* – recently reported

that "[t]he circulation of the nation's daily newspapers plunged during the latest reporting period in one of the sharpest declines in recent history…" and that "[t]he losses have accelerated as the industry tries to adjust to the steady migration of readers and advertisers to the Internet." www.nytimes.com, Newspaper Circulation Falls Sharply, Katharine Q. Seelye, October 31, 2006. Accordingly, a largely internet-based campaign is best suited to reach the target audience in this case and is far superior to printed media in achieving that goal.

      13.    *Planned Publication of Notice by Newspaper.* As provided in the proposed Settlement Agreement, the Notice will run in the weekend edition of USA Today. The weekend edition of the USA Today has a circulation of 2.5 million with approximately 5.2 million readers nationwide. It is printed and distributed on Friday, Saturday, and Sunday. The notice will be a one-quarter page ad.

      14.    *Planned Publication of the Notice through the Internet.*

    **(a) Summary***:* In addition to the newspaper publication, the notice plan also includes an internet strategy to increase likelihood potential class members will be notified of the settlement. The effectiveness of internet notification can be assessed by its ability to reach potential members of the Settlement Class and the frequency with which notice advertisements are made available to those likely to be class members. Just as the newspaper publications are judged by circulation and readership, I evaluated each internet provider and website included in the internet notification by the number of unique visits a website receives per month and the number of times that a specific notice advertisement would appear during the notice period. By using newspaper and internet notification, the proposed notice should reach in excess of 51.7 million individuals, the majority of whom are members of the target audience. United States census data reveals that there are approximately 60 million women between the ages of 15 and 44 currently residing in the United States. *See* Table 1: Annual Estimates of the Population by Five-Year Age Groups and Sex for the United States: April 1, 2000 to July 1, 2006 NC-EST2006-01, Population Division, U.S. Census Burea, May 17, 2007.

11

**(b) Website Visits:** An internet visit occurs each time a user directs her browser to a specific website. The visit continues for as long as the user selects content within a single internet domain and concludes when the user directs her browser to a new website. To say that a website receives one million unique visits per month is to say that there are one million instances where an internet user directs her browser to that site in a 30-day period.

**(c) Internet Loads:** The number of times an advertisement will load is equally important in assessing the effectiveness of an internet notification. Each time an internet user directs her browser to a website she will find advertisements that appear on the fringes of the area containing the internet content she intended to access. These banner ads contain information about a variety of subjects and direct individuals to other websites containing additional information on the same subject. In an internet notice campaign, the banner ads will indicate that by clicking the internet link provided, a potential Class Member will be directed to the official settlement website where she can learn more about a pending class action settlement. To say that a banner ad will load one million times per month is to say that the same advertisement will appear in each of one million unique visits by an internet user in a 30 day period.

**(d) Assessment and Components:** In devising this internet notice program, I assessed the target audience, number of unique visits and load frequency of the following websites. These websites are the most likely to reach potential class members and provide the most efficient combination of visits and banner ad loads. Each internet banner ad will be approximately 6 inches by ¾ of an inch and contain the following text:

> *ATTENTION OVCON CONTRACEPTIVE USERS:*
>
> *A class action settlement may affect your legal rights.*
>
> *Click here for more information: [www.ovcon35settlement.com](www.ovcon35settlement.com).*

Internet notice will run for a period of four weeks and will include placements with the following online media:

12

**(1)  Gorilla Nation Women's Channel:**  An advertisement for the notice and settlement website will run as a banner ad on the Gorilla Nation Women's Channel website.  Gorilla Nation is the largest online advertising sales representation company, handling media sales for over 400 websites and select vertical networks.  The chosen women's channel consists of 43 websites with overwhelmingly female user demographics targeting women from young adults to mature audiences.  The sites combine to receive 47.9 million unique visits per month.  The banner ad will load a total of 38.1 million times over a period of 28 days.

**(2)  iVillage:**  iVillage.com, a wholly-owned subsidiary of NBC Universal, is marketed as "the Internet for women" and consists of several online and offline media-based properties that seek to enrich the lives of women, teenage girls and parents through the offering of unique content, community applications, tools and interactive features, including the online magazine publications of Redbook, Cosmopolitan, and Good Housekeeping.  iVillage.com offers advertisers access to one in seven of all women online age 18 or older, and access to one in seven of all women online between the ages of 25 and 54.  The site receives 15 million unique visits each month.  The banner ad will load a total of 5 million times and will run for 28 days.

**(3)  Internet Service Provider Banner Ads:** Ads will be displayed on the news homepages of America Online, MSN, Comcast and other Internet Service Providers.  This placement will allow wide dissemination of the ad to viewers who may not visit any of the heavily trafficked women's websites on a regular basis.  The ad will load a total of 3.3 million times and run for 28 days.

**(4)     Google Adwords and Yahoo Keywords:** Google and Yahoo are the two largest search engines, with 5 billion searches run each month, accounting for 75% of the market share on internet searching. Placing sponsored links on each of these sites will guarantee the link appears on the first page when any user enters a search term that the parties provide as being relevant to the target demographic. These allow the most targeted placement of the ads to people investigating information that is linked to the settlement.

**(5)     PR Newswire:** A press release will be issued through PR Newswire Service (US1), which will reach over 4,000 newspapers, magazines, national wire services, and broadcast networks that are located in all 50 states and the District of Columbia. In addition, PR Newswire US1 distributes notices to 3,600 computer on-line databases, where the notices are automatically displayed on websites.

**15.**    *Toll-Free Telephone Number and Settlement Website:* The printed notice shall include a toll-free telephone number that potential class members may use to gather information about the settlement. Class members calling the number will receive the recorded message of the Notice Administrator instructing them to leave their name, number and a message about the purpose of their call. The Notice Administrator's office will return each call and provide additional information about the notice.

Both the printed notice and internet banner ads will include the address for the official settlement website which potential class members will access to learn about the settlement. The official settlement website may be found at www.ovcon35settlement.com and will be maintained by the Notice Administrator. The settlement website will contain links to the long and short form Notices, as well as the Settlement Agreement and other pertinent information.

14

**16.** *Proposed Distributions from Notice Account.* The Notice Administrator proposes to allocate money from the Notice Account in the manner outlined in Exhibit A, attached.

**17.** *Assessment of the Adequacy of the Notice Campaign.* Based upon my experience as a lawyer practicing in this area, as an administrator of notice campaigns and claims facilities, and as a teacher of class action law, I have concluded that the notice program to be used in this action is sufficient to provide extensive and clear information to the targeted population regarding this settlement, and is the best notice practicable under the circumstances.

I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 5th day of June, 2007.

_____

Orran L. Brown

**EXHIBIT A**

| Planned Notice Campaign: *In Re Ovcon 35i* ||||||||
|---|---|---|---|---|---|---|---|
| **A. Print Media** ||||||||
| 1. | **Publication** | **Circulation** | **Distribution** | **Readers** | **Ad Size** | **Dimensions** | **Estimated Cost** | **Run** |
| 2. | USA Today | 2.5 million | Subscriptions, newsstands, hotels, businesses, etc. | 5.2 million | 1/4 page B&W | 5 11/16" by 10 1/2" | $46,500 | Weekend (one run covers Friday - Sunday) |
| **B. Online Media** ||||||||
| 3. | **Publication** | **Users** | **Distribution** | **Ad Impressions / Views Generated** | **Ad Size** || **Estimated Cost** | **Run** |
| 4. | Gorilla Nation Women's Channel | 47.9 million unique visits per month | Distributed across 43 websites targeting women- young adults to mature women. | Ad will load a total of 38.1 million times. | 728 x 90 pixels (Approximately 6" x 3/4") || $95,000 | 28 days |
| 5. | iVillage | 15 million unique visits per month | Distributed across the iVillage Community. | Ad will load a total of 5.0 million times. | 728 x 90 pixels (Approximately 6" x 3/4") || $75,000 | 28 days |
| 6. | Internet Service Provider Banner Ads | Subscribers of major Internet access providers that allow advertising to all their customers across all states | Ad will be displayed on news pages of AOL, MSN, and other Internet Service Providers. | Ad will load a total of 3.3 million times. | Varies by site || $49,000 | 28 days |
| 7. | Google Adwords and Yahoo Keywords | Individuals who search for specific Adwords and Keywords chosen by the parties on these search engines. | Displayed on search result pages of the two largest search engines. | Number of times ad loads will depend on frequency of searches on selected terms. | Link appears in top right section of first search result page as a sponsored link. || $3,485 | 28 days |
| 8. | PR Newswire | Consumers of any media outlet that directly uses PR Newswire for news feeds or receives and uses the story. | Distributed to 3,600 news websites and databases and thousands of media and newspaper outlets nationwide. | Depends on number and traffic of sites that choose to post (potentially hundreds of thousands or millions of views generated of the Notice). | 500 word version of Notice will appear on news websites as a press release in full or abbreviated form. || $1,015 | 1 Press Release |

1

**EXHIBIT A**

| | Planned Notice Campaign: *In Re Ovcon 35i* | | |
|---|---|---|---|
| **C. Other Costs** | | | |
| 9. | Estimated costs associated with establishing a toll-free number, returning phone calls and other communications, registering, hosting and maintaining a website, mailing materials to requesting Class Members, and other duties. | $10,000 | |
| 10. | BrownGreer Notice Administrator Fee | $20,000 | |
| **D. Total Estimated Cost** | | **$300,000** | |

2

**EXHIBIT A**

**Additional Information on Online Media Components of Planned Notice Campaign**
*In Re Ovcon 35i*

**Gorilla Nation Women's Channel**

Gorilla Nation is the largest online advertising sales representation company, handling the media sales for over 400 websites and select vertical networks.  These websites turn over control of their advertising to Gorilla Nation, allowing Gorilla Nation to place ad campaigns targeting chosen demographics across a much wider range of viewers than a single site will garner.  The chosen women's channel consists of 43 sites with overwhelmingly female user demographics, targeting women of all ages from young adults to mature women.  The sites provide women with informative and entertaining content, including news, parenting, household tips, cooking, health, beauty advice, and online games.  The sites combine to receive over 47 million unique visitors each month.

| **Gorilla Nation Women's Channel:  43 Sites** | | |
|---|---|---|
| **Beauty** | | |
| www.beautyden.com | www.beautyriot.com | www.models.com |
| **Parenting** | | |
| www.adoption.com | www.celebritypregnancy.com | www.childfun.com |
| www.doulanetwork.com | www.familycorner.com | www.justmommies.com |
| www.families.com | www.geoparent.com | www.mainstreetmom.com |
| www.superkids.com | www.imperfectparent.com | www.momswhothink.com |
| www.mychildfun.com | | |
| **General** | | |
| www.bellaonline.com | www.idealbite.com | www.recipezaar.com |
| www.cooks.com | www.lucire.com | www.romanceclass.com |
| www.soaps.com | www.mommd.com | www.romantic-lyrics.com |
| www.wineintro.com | www.nitrolicious.com | www.sheknows.com |
| www.soapcentral.com | www.recipeland.com | |
| **Pregnancy** | | |
| www.adoption.com | www.celebritypregnancy.com | www.minti.com |
| www.justmommies.com | | |
| **Cooking** | | |
| www.chefmom.com | www.fabulousfoods.com | www.reciperewards.com |
| www.cooks.com | www.ichef.com | www.recipezaar.com |
| www.cooksrecipes.com | www.recipeland.com | www.wineintro.com |

# EXHIBIT A

### iVillage.com

iVillage.com, a wholly-owned subsidiary of NBC Universal, is marketed as "the Internet for women" and consists of several online and offline media-based properties that seek to enrich the lives of women, teenage girls and parents through the offering of unique content, community applications, tools and interactive features. iVillage.com offers advertisers one stop access to one in seven of all women online aged 18+, one in seven of all women online aged 25-54 and one in six for women aged 25-34. The site receives over 15 million unique visitors per month.

The wide network of channels at iVillage.com includes Health & Well-Being, Beauty & Style, Pregnancy & Parenting, Home & Food, Entertainment, Love & Sex, and Diet & Fitness. Additionally, they offer Astrology.com the leading Astrology site since 1995, GardenWeb.com the most popular gardening site on the Web and HealthCentersOnline, a destination for condition-specific health information online. HCO channels cover areas such as Heart, Pain, Ob/Gyn, Cancer, Allergies, Diabetes and more. iVillage also hosts many of the online Hearst magazine publications including Cosmopolitan, Redbook, Good Housekeeping and more. For the younger target audience, they offer the destination site gURL.com, the leading online community and content site for teenage girls.

### Internet Service Provider Banner Ads

While not as specifically targeted towards the women demographic, using banner advertising with major Internet Service Providers allows wide dissemination of the ad to reach viewers who may not visit any of the heavily trafficked women's sites on a regular basis. These pages are used as homepages for each provider and news sources for millions of internet subscribers (MSN, for example, reaches 45 million unique visitors). Using these sites ensures the ads are nationally distributed.

### Google Adwords and Yahoo Keywords

Google and Yahoo are the two largest search engines, with over 5 billion searches run each month, accounting for over 75% of the market share on internet searching. Placing sponsored links on each of these sites will guarantee the link appears on the first page when any user enters a search term that the parties provide as being relevant to the target demographic. While the number of actual views is limited to the number of times the selected terms are searched (from previous experience, on the order of tens to a couple hundred thousand views), these allow for the most targeted placement of the ads to people investigating information that is linked to the case.

4

**EXHIBIT A**

**PR Newswire**

PR Newswire Association LLC (www.prnewswire.com) provides electronic distribution, targeting, measurement, translation and broadcast services on behalf of tens of thousands of corporate, government, association, labor, non-profit, and other customers worldwide.  Using PR Newswire, the Notice will reach a variety of critical audiences including the news media, the investment community, government, and the general public with their up-to-the-minute, full-text news developments.  Their premium newswire will distribute the Notice to thousands of media, including major newspapers, radio stations, television stations, and websites across the nation.

The Notice will automatically reach 3,600 of the world's most widely accessed Web sites, databases and online services. Some of these destinations display members' news in full text, while others receive releases to consider for use in preparing stories for publication on their site. Websites on PR Newswire's distribution list include Yahoo!, MSN, the Wall Street Journal, Newsday, LexisNexis, Bloomberg, AOL.com, Forbes, Reuters, and thousands of other heavily trafficked news and information sources.