# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHANIE COHEN and SUNDA CROONQUIST, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No: 1:06CV00401 (CKK) ) |
| WARNER CHILCOTT PUBLIC LIMITED COMPANY, WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., GALEN (CHEMICALS), LTD., and BARR PHARMACEUTICALS, INC., | ) Jury Trial Demanded ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF THE SETTLEMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………...…….ii

I.    INTRODUCTION…………………………………………………………….2

II    BACKGROUND………………………………………………………... .3

    A.    The Litigation……………………………………………………….3

    B.    Terms of the Settlement Agreement...............................................….4

    C.    Form and Manner of Notice to the Class…………………………...5

III.   ARGUMENT...........................................................................................….6

    A.    The Settlement Should Be Approved Because It Is Fair,
       Reasonable and Adequate.............................................................….6

       1.    The Status of the Litigation at the Time of Settlement....................7

       2.    The Likelihood and Risks of Establishing Liability and Damages……9

       3.    The Reaction of the Class……………………………………....13

       4.    The Settlement is the Result of Arm's Length Negotiations
         by Experienced Counsel Who Have the Opinion that the Settlement
         is Appropriate Under All of the Circumstances……………………..14

VI.   CONCLUSION.........................................................................................19

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*In re Baan Co. Sec. Litig.,* 284 F. Supp. 2d 62 (D.D.C. 2003)……………………..…...7, 8, 14

*Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir. 1990)………………………………………12

*In re Childrens' Ibuprofen Oral Suspension*, Misc. No. 1:04-mc-0535 (ESH)
        (D.D.C. Dec. 11, 2006)…………………………………………………...…..........17

*Conroy v. 3M Corporation,* No. C-00-2810 CW (N.D. Ca. Apr. 21, 2006)…………...…… 17

*Erie Forge and Steel Inc. v. Cyprus Minerals Co*., 1994 WL 485803 (W.D.Pa.)……...……16

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768
        (3d Cir.1995), *cert. denied,* 516 U.S. 824 (1995)………………………...…….…..6

*In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568 (E.D.Pa.2003)……………..………16

*In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369 (D.D.C. 2002)………*passim*

*In re Lorazepam* v. *Clorazepate Antitrust Litig.,* No. 99-790, 2003 WL *22037741*
        (D.D.C. June 16, 2003)…………………………………………………...8,13,14

*In re Nat'l Student Mktg. Litig.,* 68 F.R.D. 151 (D.D.C. 1974)………………….…………7

*In re Newbridge Networks Sec. Litig.,* 1998 WL 765724 (D.D.C. 1998)...............................14

*Osher v. SCA Realty I, Inc.,* 945 F. Supp. 298 (D.D.C. 1996)………………..………7, 9

*Pigford v. Glickman,* 185 F.R.D. 82 (D.D.C. 1999)…………………………...………12

*State of N.Y. by Vacco v. Reebok Int'l, Ltd.*, 96 F.3d 44 (2d Cir. 1996)…………..………17

*State of N.Y. ex. rel. Koppell v. Keds Corp*, 1994 WL 97201 (S.D.N.Y.)…………..………17

*Stewart v. Rubin,* 948 F. Supp. 1077 (D.D.C. 1996)…………………………….………..14

*In re Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
        2005 U.S. Dist LEXIS 9705 (E.D.Pa.)……………….....…………………………16

*In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347 (E.D.N.Y. 2000)………………14,15,17

*In re Vitamins Antitrust Litig.,* 305 F. Supp. 2d 100 (D.D.C. 2004)…………….... *passim*

*In re Vitamins Antitrust Litig.,* Misc. No. 99-197, 2000 U.S. Dist. LEXIS 8931
    (D.D.C. Mar. 31, 2000)……………………………………………………...……12, 14

## FEDERAL STATUTES

Fed. R. Civ. P. 23(e)……………………………………………………………………6, 19

Sherman Act, 15 U.S.C. § §1, 2 ………………………………………………………...……..4

## MISCELLANEOUS

NEWBERG ON CLASS ACTIONS Fourth Ed. §11.51……………………………….………14

NEWBERG ON CLASS ACTIONS Fourth Ed. §11.20……………………….……………17

## I.    <u>INTRODUCTION</u>

Consumer Plaintiffs, Stephanie Cohen and Sunda Croonquist, and Defendants, Warner Chilcott Public Limited Company, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., Galen (Chemicals), Ltd. (together "Warner Chilcott") and Barr Pharmaceuticals, Inc. ("Barr"), submit this memorandum in support of their Joint Motion for Final Approval of the Settlement of this Consumer Action.[1]

This proposed settlement is the result of arms-length negotiations spanning several months that included the assistance of Magistrate Judge Alan Kay.  As described below, extensive discovery was conducted prior to reaching the proposed settlement, including over twenty depositions, the production and review of over one million documents, and Class Counsel filing a declaration by Plaintiffs' expert.  Moreover, the parties had fully briefed Defendants' Joint Motion to Dismiss Plaintiffs' Amended Complaint, and Class Counsel had filed Plaintiffs' Motion for Class Certification.  The extensive work performed prior to reaching settlement allowed the parties to make a meaningful assessment of the strengths and weaknesses of their positions.

On June 27, 2007, this Court entered an order preliminarily approving the settlement and directing dissemination of notice.  Notice has been published and the time to object and opt-out has now passed.  Not one consumer, out of approximately two million, has chosen to opt-out of this settlement, and there has been only a single objection.  The lack of opt-opts and the dearth of objectors evidences the merits of this settlement.  As detailed below, the settlement is fair,

---

[1] Unless otherwise noted, capitalized terms are used herein as defined in the Consumer Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Preliminary Approval of the Settlement, filed with the Court on June 5, 2007 ("Plaintiffs' Preliminary Approval Memo"), or in the Settlement Agreement Between Consumer Plaintiffs and Defendants, signed on May 16, 2007 and appended as Exhibit A to Plaintiffs' Preliminary Approval Memo.

reasonable and adequate, and in the best interest of the Class.  Thus, the settlement fully meets the criteria established by this Court in approving class action settlements and should be finally approved.

## II.    BACKGROUND

### A.    The Litigation

On April 19, 2006, the Consumer Plaintiffs filed an Amended Class Action Complaint alleging that Defendants had participated in an unlawful conspiracy to restrain trade in which Barr agreed not to market a generic version of Warner Chilcott's Ovcon 35 in exchange for payments from Warner Chilcott.  Plaintiffs asserted that Defendants' conduct was in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, the antitrust and/or consumer protection statutes of the "Indirect Purchaser" states, and the unjust enrichment laws of the fifty states.

On May 5, 2006, Defendants filed a Joint Motion to Dismiss Plaintiffs' Amended Complaint, seeking to dismiss the majority of Plaintiffs' claims.  On May 19, 2006, Plaintiffs filed a Memorandum in Opposition to Defendants' Joint Motion to Dismiss.  On June 1, 2006, Defendants filed a Joint Reply in Support of their Motion to Dismiss Plaintiffs' Amended Class Action Complaint.  At the time of settlement, that motion was fully briefed and pending before the Court.

Extensive discovery took place in this action.  Plaintiffs' counsel reviewed approximately one million documents, attended approximately twenty depositions, and consulted with Plaintiffs' expert, Edward Heiden, Ph.D. regarding economic issues, including the economic impact of Warner Chilcott's continued free sampling of Ovcon 35 after entering into the challenged agreement with Barr and quantification of any claimed damages by consumers.  Class Counsel also reviewed the reports of Defendants' experts, Drs. Sumanth Addanki, Gregory Bell,

Henry Grabowski, John Hauser, Jerry Hausman, and Tracy Lewis, which were served in the related government actions.

On March 23, 2007, Plaintiffs filed their Motion for Class Certification, which included the declaration of Plaintiffs' expert economist, Edward J. Heiden, Ph.D.

On May 16, 2007, following months of negotiations, the parties executed the Settlement Agreement.  On June 27, 2007, this Court entered an order conditionally approving certification of the Class, preliminarily approving the settlement and providing the form and manner of notice to the Class.

### B.    Terms of the Settlement Agreement

Pursuant to the Settlement Agreement, Warner Chilcott and Barr will each donate $3 million worth of combined hormonal contraceptive products throughout the United States to (1) primary care physicians not currently receiving samples of the donated products who prescribe combined hormonal contraceptives, (2) university health centers or clinics, or (3) charitable organizations providing reproductive healthcare services to women, for a total product donation worth $6 million at retail value.  Warner Chilcott and Barr have also agreed to pay $1 million each, for a total value of $2 million, into a fund which, subject to Court approval, will be used to pay reasonable attorneys' fees and expenses incurred by Plaintiffs' counsel and any incentive awards to the named Plaintiffs.  Additionally, Warner Chilcott and Barr paid $150,000 each, for a total value of $300,000, into a fund that was used to provide notice to the Settlement Class and pay for notice administration expenses.  Under the terms of the Settlement, Plaintiffs and each member of the Settlement Class shall release all claims against Defendants relating to the prices paid for Ovcon during the Class Period.  *See* Settlement Agreement ¶ 27.

C.     **Form and Manner of Notice to the Class**

In its June 27, 2007 order, this Court approved both the form and manner of giving notice to the Class and found the publication of notice in the weekend edition of USA Today and through an internet notice campaign to be the "best notice practicable under the circumstances . . . in full compliance with the notice requirement of Rule 23 of the Federal Rules of Civil Procedure and due process of law." (June 28, 2007 Order Conditionally Certifying Settlement Class and Preliminarily Approving Proposed Settlement Between Consumer Class Plaintiffs and Defendants at ¶ 7.) Accordingly, the Short Form Notice ran in the weekend edition of USA Today from Friday, August 3, 2007, through Sunday, August 5, 2007. Publishing the notice in this national newspaper provided an estimated circulation of 2.5 million and estimated readers of 5.2 million. *See* Declaration of Orran Brown (Exhibit 1) ("Brown Decl."), ¶ 10.

In addition to newspaper publication, notice was published through the following internet notice campaign targeted toward women of reproductive age (*i.e.*, between 18 and 44):

> **(1) Gorilla Nation Women's Channel:** An advertisement for the notice and settlement website ran as a banner ad on the Gorilla Nation Women's Channel network of websites from August 3, 2007, through August 30, 2007. The advertisement was available to be viewed 38,196,524 times during the notice period.
>
> **(2) iVillage:** An advertisement for the notice and settlement website also ran as a banner ad on the iVillage network of websites from August 3, 2007, through August 30, 2007. The advertisement was available to be viewed 5,253,089 times during the notice period.
>
> **(3) Internet Service Provider Banner Ads:** An advertisement for the notice and settlement website appeared as a banner ad on the home pages of the internet service providers America Online, MSN and Comcast from August 3, 2007, through August 30, 2007. On America Online, the ad was available to be viewed 3,333,928 times; on MSN, 11,060,995 times; and on Comcast, 5,007,769 times.
>
> **(4) Google Adwords and Yahoo Keywords:** The Internet strategy included 20 keyword searches on the Google and Yahoo search engines. When a user entered any of these 20 keywords, the website for the Ovcon settlement appeared as a sponsored

link.  Through Google and Yahoo searches, users were able to view the link for the settlement website 322,424 times.

**(5) PR Newswire:**  On August 3, 2007, a press release was issued through PR Newswire Service (US1), reaching over 4,000 newspapers, magazines, national wire services, and broadcast networks that are located in all 50 states and the District of Columbia.  In addition, PR Newswire US1 distributes notices to 3,600 computer on-line databases, where the notices are automatically displayed on websites.

*See* Brown Decl., ¶ 11.

The notice program fully apprised Class Members of the content of the Settlement Agreement and their rights thereunder, including the right to opt-out or object to the settlement.

The notice clearly stated that Class Members had until September 17, 2007 to opt-out of the settlement and set forth the procedure for doing so.  No consumer chose to opt-out of the Class Settlement.  The notice also clearly stated that Class Members had until September 17, 2007 to object to the settlement and set forth the procedure for doing so.  Only one objection out of approximately two million consumers was received.

## III.    ARGUMENT

### A.    The Settlement Should be Approved Because it is Fair, Reasonable and Adequate.

Prior to approving a settlement, the court must ensure that the terms of the settlement are "fair, reasonable and adequate."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995), *cert. denied*, 516 U.S. 824 (1995). This reflects the requirements of Fed. R. Civ. P. 23(e) which states, in relevant part:

> (1)(C)  The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.

This Court has recognized that settlement is particularly appropriate in class actions given the judicial resources required to be allocated and the level of litigation expenses likely to be incurred. *In re Baan Co. Sec. Litig.,* 284 F. Supp. 2d 62, 63-64 (D.D.C. 2003), *citing Osher v. SCA Realty I, Inc.,* 945 F. Supp. 298, 304 (D.D.C. 1996). In addition, the inquiry on a motion to approve a class settlement is a limited one and courts "must avoid deciding or trying to decide the likely outcome of a trial on the merits" when deciding whether to approve a proposed settlement. *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d at 64, *citing In re Nat'l Student Mktg. Litig.,* 68 F.R.D. 151, 155 (D.D.C. 1974).

No single test exists in this Circuit for determining whether a class settlement should be approved. *In re Vitamins Antitrust Litig.,* 305 F. Supp. 2d 100, 103 (D.D.C. 2004). The courts judge reasonableness, fairness and adequacy under the circumstances of the case. *Id.* at 103-4. In making their determination, courts in this Circuit may look at the following factors: (1) the status of the litigation at the time of settlement; (2) the likelihood and risks of establishing liability and damages; (3) the reaction of the class; and (4) whether the settlement is the result of arm's length negotiations by experienced counsel who have the opinion the settlement is appropriate under all of the circumstances. *See, e.g., id.* at 104, n. 1-5 (cited cases omitted); *Baan,* 284 F. Supp. 2d at 64. Application of these factors merits a finding that the settlement is fair, reasonable and adequate.

### 1.     The Status of the Litigation at the Time of Settlement

In evaluating a proposed settlement, courts consider "…the stage of the proceedings when settlement has been offered and [the] degree of completed discovery." *In re Nat'l Student Mktg. Litig.,* 68 F.R.D. 151, 155 (D.D.C. 1974). "Courts thus consider whether counsel had

sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and the range of recovery." *Lorazepam & Chlorazepate*, 205 F.R.D. at 377.

Speedy and efficient resolution of what otherwise could be long, complex and expensive litigation is to be encouraged. *See, e.g., In re Lorazepam & Clorazepate Antitrust Litig.,* No. 99-790, 2003 WL 22037741, at *4 (D.D.C. June 16, 2003). Settlements that do not come too early to be suspicious or too late to be a waste of resources, but which come at a desirable point in litigation for the parties to reach an agreement and to resolve issues without further delay, expense, and litigation are favored. *Vitamins*, 305 F. Supp. 2d at 105.

The proposed settlement is the product of an extensive analysis of the factual and legal issues involved in this case. Prior to the commencement of settlement negotiations, Class Counsel had reviewed approximately one million documents and participated in approximately twenty depositions. Additionally, Class Counsel and Defendants' counsel engaged in extensive briefing of the issues in this case, including Defendants' Joint Motion to Dismiss Plaintiff's Amended Complaint and Plaintiffs' Motion for Class Certification. Class Counsel also purchased and reviewed significant amounts of data from IMS Health (a recognized industry source of data in the pharmaceutical industry), retained and consulted with an expert economist and other economic consultants, and obtained an expert report on class certification. Additionally, Class Counsel reviewed nine lengthy expert reports exchanged in the related Government actions. Defendants' experts opined on topics such as the high degree of substitutability among the more than 80 contraceptives on the market today, the relative cost of a generic version of Ovcon compared to the cost of branded Ovcon when the effective price discount associated with Warner Chilcott's free product sampling is taken into account, and the

economic rationale and procompetitive benefits of the challenged agreements with Barr.  There

is no question that, at the time settlement was reached, both parties possessed very well-

considered views of the merits of their respective positions and the potential for, and likely

amount, of any recovery.  *See Osher v. SCA Realty, Inc.*, 945 F. Supp. 298, 305 (D.D.C. 1996)

(finding it significant that counsel had "an adequate appreciation of the merits of the case").

### 2.    The Likelihood and Risks of Establishing Liability and Damages

Consumer Plaintiffs faced several substantial hurdles to establishing both liability and

damages.  First, Plaintiffs faced the defense that the exclusive license and supply agreements

between Warner Chilcott and Barr were entered into for legitimate business reasons, namely

because Warner Chilcott was experiencing serious supply problems with its then supplier of

Ovcon, Bristol Myers-Squibb ("BMS").  Defendants offered contemporaneous evidence of

substantial and on-going problems with BMS's supply of Ovcon to Warner Chilcott and alleged

that Warner Chilcott entered into the agreements to ensure a steady and reliable supply of Ovcon.

Defendants also alleged, and provided expert testimony by Dr. Tracy Lewis, that an exclusive

license agreement with Barr was the best way to ensure steady, reliable supply of Ovcon 35 to

Warner Chilcott.  If these arguments were accepted, a jury could have found that no violation of

the antitrust laws occurred.

Second, Plaintiffs faced the defense that, due to the continuation of substantial free

sampling of Ovcon by Warner Chilcott as a result of the challenged agreement, the agreements

were not anti-competitive.  Defendants alleged that consumers actually would have paid more for

generic Ovcon than for the sampled branded Ovcon when the effective price discount associated

with free sampling of Ovcon 35 is taken into account.  To support this contention, Defendants

provided the expert testimony and analyses of Drs. Addanki, Bell, Grabowski, Hauser and

Hausman.   Defendants provided evidence that Ovcon is a heavily sampled product and that free

samples accounted for 40% of the packs of Ovcon distributed between April 2004 and

September 2006.  Defendants contended that these free samples represent a substantial price

discount to consumers.  Once a generic version of Ovcon had entered the market, Defendants

contended that Warner Chilcott would have stopped distributing free samples to physicians

because it no longer would have had the sufficient economic incentive to promote Ovcon 35

aggressively owing to state laws either allowing or mandating pharmacists to substitute the

generic form of Ovcon for branded Ovcon.  Given the vast quantities of free samples distributed

by Warner Chilcott, Defendants' experts opined that the savings to consumers from free samples

given before a generic entered the market resulted in a lower price for the branded product than

consumers would have received when a generic entered the market and sampling ceased.

        As depicted in the chart below, Dr. Grabowski opined that Barr's generic would have

offered consumers an approximate 9% discount off the price of branded Ovcon and would have

been priced at approximately $38 per pack.  Dr. Grabowski opined, however, that the effect of

Warner Chilcott's heavy sampling of Ovcon 35 was to provide an approximate 30% discount off

the price of branded Ovcon, resulting in an effective price of $31 per pack of branded Ovcon.  If

Dr. Grabowski's calculations, or those of any of the Defendants' experts who discussed

sampling, were accepted by the jury, it could find that consumers were not harmed by the

Defendants' Agreement and that no violation of the antitrust laws had occurred.



**Expected But-for Price of Ovcon Generic vs.
Effective Price of Ovcon for Consumers**

Note:  [1] The average price for Ovcon is calculated between April 2004 and September 2006.
[2] The expected price discount for Barr's AB-Rated generic ranges from 10% to 20%.  The average discount of 13%  is used in the chart.
[3] The effective price discount from free samples of Ovcon ranges from 28% to 31%.  The average of 30% is used in the chart.

    Defendants also alleged, and supported by expert testimony, that as a result of sampling Plaintiffs suffered minimal or no damages.  If Defendants' above-outlined sampling argument was accepted, a jury could have found that, even if a violation of the antitrust laws had occurred, Plaintiffs suffered only nominal or no damages.

    Third, Plaintiffs faced the defense that Ovcon 35 competed with over 80 other brand-name and generic oral contraceptives, and not solely with its generic version, as Plaintiffs had contended.  Defendants produced contemporaneous documents and their employees testified in support of their defense that Warner Chilcott viewed other branded oral contraceptive manufacturers as competitors.  In addition, Defendants continue to contend that documents produced and testimony given by third-party oral contraceptive manufacturers in this action support their argument that oral contraceptives are equally efficacious and interchangeable. Defendants also provided the expert testimony of Drs. Addanki, Bell and Hausman, among other

evidence, that consumer switching behavior demonstrates that Ovcon competes with dozens of other combined hormonal contraceptives, and that consumers could have purchased another lower-priced brand-name or generic alternative.  Again, if this argument in support of a broader market definition were accepted, a jury could have found that no violation of the antitrust laws had occurred.

Indeed, even if Plaintiffs were to prevail over these substantial obstacles at trial, costly and time-consuming appeals could follow whereas this settlement allows for a relatively prompt recovery.  *Pigford v. Glickman*, 185 F.R.D. 82, 104-05 (D.D.C. 1999).  It is also likely, as in many complex antitrust actions, that even if Plaintiffs had succeeded at trial, "any verdict inevitably would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case."  *In re Vitamins Antitrust Litig.,* Misc. No. 99 - 197, 2000 U.S. Dist. LEXIS 8931, at *24 (D.D.C. Mar. 31, 2000); *see also In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 393 (D.D.C. 2002).  On appeal, of course, antitrust verdicts may be reversed.  *See, e.g., Backman* v. *Polaroid Corp.,* 910 F.2d 10, 17-18 (1st Cir. 1990) (reversing substantial verdict for the class and dismissing the case after eleven years of litigation).  Even if Plaintiffs won at trial and on appeal, litigating this case to its conclusion could take years.  "By contrast, the settlement negotiated by the parties provides for relatively prompt recovery."  *Pigford v. Glickman,* 185 F.R.D. 82, 104-05 (D.D.C. 1999).

Given the complexities and uncertainties inherent in complex antitrust cases and the unique challenges and risks posed by this case, the proposed settlement clearly provides a significant benefit to the Class.  Certainly, it falls well "within the range of fair, adequate and reasonable settlements deserving of final approval."  *Vitamins,* 305 F. Supp. 2d at 105.

3.    **The Reaction of the Class**

The existence of relatively few objections counsels in favor of approval.  *Cf. In re Lorazepam*, 2003 WL 22037741, at *5.  Here, not a single consumer opted-out, and there was one lone objection filed.  The meager *four sentence* argument (which at best can be described as a "placeholder" objection) claiming that "the proposed settlement is unfair, inadequate and unreasonable" reflects no meaningful or particularized understanding of the complex issues in this case.  As discussed more fully below, the value of the settlement is approximately 75 percent of Class Counsel's estimation of single damages – an excellent result.  Nonetheless, the objector states – without any support – that "this settlement is grossly inadequate."  Indeed, the objector evidences even the most basic lack of familiarity with this case; for example, he complains that the settlement was inadequate because it does not "result in the launch of a generic Ovcon 35 in the future."  As this Court and the parties are aware, Barr publicly launched its generic *Balziva* in the fall of 2006, prior to the negotiation and execution of this Settlement Agreement, rendering that issue moot.  Moreover, as discussed below, a charitable donation is the only viable method of distribution because the cost of administering individual claims and the cost to consumers to obtain required records and proof of claims would entirely swallow any individual recoveries.

Finally, although Class Counsel achieved a settlement valued at approximately 75 percent of their estimated damages, the objector next argues that Class Counsel's proposed attorneys' fees are excessive because "[h]ere, there is no success."  To the contrary, the success of this settlement is plain.  It is telling that, despite demonstrating no investigation into the reasonableness of this settlement, counsel for the objector then requested attorneys' fees *for himself* for filing an objection.  Simply stated, this barebones objection evidences no understanding of the complex issues in this case and lacks any merit.  The fact that there was

only one objection and no opt-outs from such a large class raises a strong inference that Class

Members are satisfied with the result.  *Baan,* 284 F. Supp. 2d at 66, *citing In re Newbridge*

*Networks Sec. Litig.,* 1998 WL 765724 at *2 (D.D.C. 1998).

      **4.**     **The Settlement Is The Result of Arm's Length Negotiations By
Experienced Counsel Who Have The Opinion That The Settlement Is
Appropriate Under All Of The Circumstances**

In approving class settlement, courts in this Circuit and others have repeatedly and

expressly deferred to the judgment of experienced counsel achieving class-wide settlements

through arm's-length negotiations.  Chief Judge Hogan observed that "[a] presumption of

fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length

negotiations between experienced, capable counsel after meaningful discovery."  *In re*

*Lorazepam*, 2003 WL 22037741 at *2 (quotation omitted); *see also Vitamins*, 305 F.Supp. 2d at

104; *In re Vitamins Antitrust Litig.*, No. 99-197, 200 U.S. Dist. LEXIS 8931, at *22 (D.D.C.

Mar. 31, 2000); *Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996); *see also* Newberg on

Class Actions § 11.51 ("[C]ourts respect the integrity of counsel and presume the absence of

fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered.").

That presumption should attach here.

Every aspect of the proceedings, from motion practice through the completion of the

settlement negotiations, had been sharply contested.  The proposed settlement is the product of

contentious negotiations, which took place over the span of several months.  The negotiations

included several face to face meetings and numerous conference calls between counsel, as well

as oversight by Magistrate Judge Kay.  In fact, the negotiations were so hard fought that on more

than one occasion counsel from both sides were required to request that this Court extend the

stay of discovery so that the parties would have more time to negotiate the terms of the Settlement Agreement.

Here, Warner Chilcott and Barr will each donate $3 million worth of combined hormonal contraceptive products throughout the United States, for a total product donation worth $6 million at retail value. Warner Chilcott and Barr have also agreed to pay $1 million each, for a total value of $2 million, into a fund which, subject to Court approval, will be used to pay reasonable attorneys' fees and expenses incurred by Plaintiffs' counsel and any incentive awards to the named Plaintiffs. Additionally, Warner Chilcott and Barr paid $150,000 each, for a total value of $300,000, into a fund that was used to provide notice to the Settlement Class and pay for notice administration expenses. In *Vitamins*, Chief Judge Hogan held that it was appropriate to regard attorneys' fees as comprising part of the constructive common fund. *Id*. at *9 (further observing that it has been "…recognized that in constructive common fund cases, where attorneys' fees are borne by defendants and not plaintiffs, that the attorneys' fees nonetheless are a valuable part of the settlement and thus fairly characterized as part of the common fund"). Thus, the total value of the common fund is $8.3 million.

Consumer Plaintiffs, who retained economist Edward Heiden, Ph.D. of Heiden & Associates, calculated top-end single damages of approximately $12 million.[2] Dr. Grabowski, one of Warner Chilcott's economists, opined that because free Ovcon samples were given to consumers before a generic launch that would not be distributed after a generic launch, the Agreement between Warner Chilcott and Barr provided consumers with substantial benefits and increased both total and consumer surplus.

Given the risk factors discussed above, a significant discount to settle would be warranted. Nonetheless, Consumer Plaintiffs have achieved a settlement value that exceeds 75

---

[2]     Declaration of Robert W. Sink (Exhibit 2) ("Sink Decl."), ¶ 3.

percent of the highest estimate of single damages (which was subject to challenge because, among other things, it did not take into account the potential effect of free sampling by Warner Chilcott on Plaintiffs' damages claims). Other settlements involving dramatically smaller percentages of single damages have been routinely approved. *See, e.g. In re Childrens' Ibuprofen Oral Suspension*, Misc. No. 1:04-mc-0535 (ESH) (D.D.C. Dec. 11, 2006) (approximately 25 percent of total damages approved); *In re Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 U.S. Dist LEXIS 9705, * 30 (E.D.Pa. May 20, 2005) (11.4 percent of total damages approved and compared favorably to settlements in other complex class actions and citing cases); *In re Linerboard Antitrust Litig.*, 296 F. Supp.2d 568 (E.D.Pa. 2003) (36 percent of damages approved); *Erie Forge and Steel Inc. v. Cyprus Minerals Co.*, Civil No. 94-404, 1994 WL 485803 (W.D.Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million, or 8.1 percent).

It is estimated that approximately two million consumers purchased Ovcon during the Class Period. Sink Decl., ¶ 7. Because the value of the consumer fund was $6 million, and there were two million putative Class Members, it became clear that the cost of administering individual claims and the cost to consumers to obtain required records and proof of claims would swallow any individual recoveries. Since individual distributions were not economically feasible, it became evident that a resolution involving a product donation to universities, health clinics, physicians who do not receive free samples, and charitable organizations was the most viable way indirectly to benefit female consumers of reproductive age. "In a settlement context, when an aggregate class recovery cannot economically be distributed to class members . . . the parties, subject to court approval, may agree that . . . funds [or products] will be distributed or disposed of for the indirect benefit of the class . . . [T]hese distributions have obtained a stamp of

16

approval as part of a class settlement." Newberg on Class Actions, Fourth Ed., § 11:20 (citations

omitted). Such distributions have been approved in other cases with similar circumstances where

the cost of administration would consume any distributions. *See In re Childrens' Ibuprofen Oral*

*Suspension*, Misc. No. 1:04-mc-0535 (ESH) (D.D.C. Dec. 11, 2006) ($3 million product

donation settlement approved); *Conroy v. 3M Corporation*, No. C-00-2810 CW (N.D.Ca. Apr.

21, 2006) (approving settlement where 3M donated tape and other product valued at $41 million

to charities throughout the United States).

   It has been held that "[t]he decision to forego individual recoveries was sensible, given

the difficulty of identifying proper claimants and the difficulty, and especially the costs, that such

recoveries and their administration would have entailed. The net monetary relief for any

individual claimant would have been limited." *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D.

347, 353 (E.D.N.Y. 2000). In *Reebok Int'l, Ltd.,* 96 F.3d. 44 (2d Cir. 1996), the Second Circuit

upheld such a settlement where distributions "would be consumed in the costs of . . .

administration." *Id.* at 49; See also *Keds Corp.*, 1994 WL 97201, at *3 (approving charitable

distribution of settlement proceeds in lieu of direct refunds to individual consumers where the

damages per customer were small, it would be difficult if not impossible to trace the purchasers,

and the costs of administration would "wipe out any economic benefit of the settlements").

   Here, it is neither practical nor economical to provide benefits directly to individual Class

Members for several reasons. First, while the Settlement Class is very large, the alleged

overcharge that would have resulted from each consumer purchase is small at best. Excluding

the effective price discount associated with continued free sampling by Warner Chilcott, branded

Ovcon had an average retail price of approximately $44 per pack from April 2004 through

September 2006. Defendants estimate that a generic version of Ovcon would have had an

average retail price of approximately $38 per pack during that period. Thus, Defendants

contended that consumer damages would be at most $6 per pack (again before taking into

account the price discount associated with free sampling). Second, Defendants offered expert

testimony that most women stay on an oral contraceptive for relatively short periods, which, if

accepted, would further limit the amount of any potential recovery by consumers. Third, Class

Members are spread out over a wide geographic area. Fourth, Defendants contended that any

alleged overcharge would have to be decreased by the amount of any free Ovcon samples a

particular consumer received, which would require an expensive, time consuming and

individualized inquiry into the purchasing and sampling history of each consumer. Finally, most

Class Members will not have kept records that confirm their Ovcon 35 purchases or samples

received, making it even more costly to identify the proper claimants and determine what amount

to distribute to them. Simply stated, individual cash payments to the Class Members would not

be economically feasible given the complexity and unique challenges posed by this case. Thus,

the proposed settlement falls "within the range of fair, adequate and reasonable settlements

deserving of [approval]." *Vitamins*, 305 F.Supp. 2d at 105.

   The proposed settlement falls within the range of fair, adequate and reasonable

settlements for another reason: the donated product will provide an enormous benefit to Ovcon

consumers and will have particular utility for one group of Ovcon consumers that has recently

lost some of the benefit of sampling. Recently, the *Wall Street Journal* reported that drug

companies have stopped offering discounts for birth control pills to university health services,

and that "[h]ealth professionals say it's particularly critical for college women to have access to

cheap contraception." *College Students Face Rising Birth-Control Prices*, Wall St. J., July 26,

2007, at D1. That the proposed settlement allows for Warner Chilcott and Barr to provide

samples to university health centers demonstrates one clear way in which the settlement, though not a direct distribution to consumers, is designed to and will inure to the benefit of Ovcon consumers.

Finally, the "[o]pinion of experienced and informed counsel should be afforded substantial consideration" by a court in evaluating the reasonableness of a proposed settlement. *Lorazepam & Clorazepate,* 205 F.R.D. at 380. Class Counsel and Counsel for the Defendants firmly believe that the proposed settlement is fair, reasonable, and adequate. Sink Decl., ¶ 13. Indeed, Plaintiffs have achieved a settlement value that exceeds 75 percent of single damages, as calculated by Class Counsel. *Id.* Counsel is experienced in class action and antitrust matters. *Id.* Consequently, the opinion of Counsel that the proposed settlement is "fair, adequate, and reasonable" is deserving of this Court's consideration. *Vitamins*, 305 F. Supp. 2d at 106; *see also Lorazepam & Clorazepate*, 205 F.R.D. at 380.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Consumer Plaintiffs and Defendants jointly and respectfully request that this Court grant final approval of the settlement pursuant to Federal Rule of Civil Procedure 23(e).

Respectfully submitted,

_____/s/_____
Robert W. Sink, Esquire, Bar No. PA0022
LAW OFFICES OF ROBERT W. SINK
319 West Front Street
Media, PA 19063
Tel:    610-566-0800
Fax:    610-566-4408

Dated:  October 2, 2007                              *Attorneys for Plaintiffs and the Class*

                                           _____
                                                     /s/
                                           Peter C. Thomas (D.C. Bar # 495928)
                                           Andrew M. Lacy (D.C. Bar # 496644)
                                           SIMPSON THACHER & BARTLETT LLP
                                           601 Pennsylvania Avenue, N.W.
                                           North Building
                                           Washington, DC 20004
                                           (202) 220-7700
                                           (202) 220-7702 (fax)

                                           Charles E. Koob (*Pro Hac Vice*)
                                           SIMPSON THACHER & BARTLETT LLP
                                           425 Lexington Avenue
                                           New York, New York 10017-3954
                                           (212) 455-2000
                                           (212) 455-2502 (fax)

                                           *Counsel for Warner Chilcott Holdings*
                                           *Company III, Ltd, Warner Chilcott*
                                           *Corporation, Warner Chilcott*
                                           *(US) Inc., and Warner Chilcott Company,*
                                           *Inc.*

                                           _____
                                                     /s/
                                           Mark L. Kovner (D.C. Bar # 430431)
                                           Karen N. Walker (D.C. Bar # 412137)
                                           Chong S. Park (D.C. Bar # 463050)
                                           KIRKLAND & ELLIS LLP
                                           655 Fifteenth Street, N.W., Suite 1200
                                           Washington, DC 20005
                                           (202) 879-5000
                                           (202) 879-5200 (fax)

                                           *Counsel for Barr Pharmaceuticals, Inc.*